```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK

------------------------------X Docket#
JGIAP RH 160 LLC,                 : 21-CV-02489(DG)(JRC)
                 Plaintiff,       :
                                  :
     - versus -                   : U.S. Courthouse
                                  : Brooklyn, New York
CRI HOLDING CORP., ET AL.,        :
                                  : September 3, 2021
                 Defendants       : 12 p.m.
------------------------------X
   TRANSCRIPT OF CIVIL CAUSE FOR PRE-MOTION CONFERENCE
           BEFORE THE HONORABLE DIANE GUJARATI
              UNITED STATES DISTRICT JUDGE
```

**A P P E A R A N C E S:**
**(VIA VIDEO/AUDIO)**

| | |
|---|---|
| **For the Plaintiff**: | **Ryan M. Wilson, Esq.** |
| | **Nicholas Peppler, Esq.** |
| | Armstrong Teasdale LLP |
| | 919 Third Avenue, 37th Floor |
| | New York, NY 10022 |
| | |
| **For Defendants CRI** **and Naghieh**: | **Mark S Friedlander, Esq.** |
| | 15 Maiden Lane, Suite 2000 |
| | New York, NY 10038 |
| | |
| **For Defendant Morali**: | **Scott K. Winikow, Esq.** |
| | Donovan Hatem LLP |
| | 112 W. 34th Street |
| | New York, NY 10120 |
| | |
| **For Defendants Manda**, **Strikeforce, and** **Corrao**: | **Michael James Mauro, Esq.** |
| | 70 Vineyard Lane |
| | Stamford, CT 06902 |
| | |
| | **Emanuel Kataev, Esq.** |
| | **Kyle F. Oakes Monaghan, Esq.** |
| | Milman Labuda Law Group PLLC |
| | 3000 Marcus Avenue, Suite 3W8 |
| | Lake Success, NY 11042 |
| | |
| **Transcription Service**: | **Transcriptions Plus II, Inc.** |
| | RL.Transcriptions2@gmail.com |

```
Proceedings recorded by electronic sound-recording,
transcript produced by transcription service
```

2

                          Proceedings

1           THE CLERK:  Civil Cause for Pre-Motion

2    Conference in Docket Number 21-CV-2489, *JGIAP RH 160 LLC*

3    *v. CRI Holding Corp., et al.*

4           Before asking the parties to state their

5    appearances, I would like to note the following:

6           Persons granted remote access to proceedings

7    are reminded of the general prohibition against

8    photocopying, recording, and re-broadcasting of court

9    proceedings.  Violation of these prohibitions may result

10   in sanctions including removal of court issued media

11   credentials, restricted entry to future hearings, denial

12   of entry to future hearings, or any other sanctions

13   deemed necessary by the Court.

14          Counsel, please state your appearances for the

15   record starting with the plaintiff.

16          MR. WILSON:  Good afternoon, your Honor.  This

17   is Ryan Wilson of Armstrong Teasdale on behalf of JGIAP

18   RH 160 LLC, the plaintiff.  I am also joined today by my

19   colleague, Nicholas Peppler.

20          THE COURT:  Good afternoon to you both.

21          MR. MAURO:  For the defendant Manda

22   International, Strikeforce Mechanical, and Angelo Corrao,

23   Michael J. Mauro, Emmanuel Kataev of the Milman Labuda

24   Law Group.

25          MR. MONAGHAN:  And Kyle F. Monaghan.

3

                              Proceedings

 1          MR. MAURO:  Mr. Monaghan is also sitting in the

 2   room with us.  He's an associate.

 3          THE COURT:  Good afternoon.

 4          MR. FRIEDLANDER:  For the defendant, the

 5   defendants, excuse me, CRI Holding Corp. and Touraj

 6   Naghieh; Mark S. Friedlander.

 7          THE COURT:  Good afternoon to you.

 8          MR. WINIKOW:  Your Honor, and for the Morali

 9   defendants, Anthony Morali, Joseph Morali, and Morali and

10   Associates; Scott Winikow from Donovan Hatem.  Also that

11   may be on the line, Joe Morali.  One of my clients may be

12   on the line but I've asked him to be mute.

13          THE COURT:  Good afternoon.  I'm sorry, just

14   pronounce your last name for me?

15          MR. WINIKOW:  Scott Winikow, W-I-N-I-K-O-W.

16          THE COURT:  Okay.  Thank you.  So we're

17   convened today on the defendant's anticipated motion to

18   dismiss.  I don't know who of the defendants wants to

19   take the lead, but I would like to hear you out, each of

20   you, on your intended motion.  So Mr. Friedlander, shall

21   we start with you or if you all have --

22          MR. FRIEDLANDER:  That's fine, your Honor.

23   That's fine.  Since I'm the first one in the caption, I

24   guess I should go first.

25          THE COURT:  Okay.  Go ahead.

4

Proceedings

1          MR. FRIEDLANDER:  You know, initially, your

2    Honor, there are some points that I think that are

3    threshold that we should address.

4          In my mind, there's a question at the beginning

5    regarding the standing of this particular plaintiff.  You

6    know --

7          THE COURT:  Yes, I was going to ask you about

8    that.  I'd like to hear you out on that.

9          MR. FRIEDLANDER:  You know, perusing the

10   complaint, I don't see any allegations of any economic

11   damage.  They make all these, you know, these blustering

12   allegations without any real material facts being

13   presented to show they've been hurt by anything that my

14   client has particularly done.

15         And you know, again, maybe as a corollary to

16   this, there's a question what's the enterprise that we're

17   talking about here.  Okay?  We have a business

18   relationship.  My client has a contractual relationship

19   with the original developer which was -- forgive me, I'm

20   blanking out the name.  I think it's Red Hook 160, LLC.

21   Right?

22         And the services that were to be rendered were

23   strictly advisory services that my client fulfilled.  My

24   client's main function was to go and get a temporary

25   certificate of occupancy, which was obtained, and then it

5

Proceedings

1  was renewed.  And then they were terminated.

2          So I don't see how, you know, the acts of my

3  client caused any economic harm to this particular

4  plaintiff.  In fact, my client's work were a benefit to

5  this project.  So I don't understand how they have

6  standing to claim that my client inflicted any economic

7  harm on them.  So that's my standing question, your

8  Honor.

9          I'm sorry, my allergies are settling in my

10  throat.  I apologize for losing my voice.

11          THE COURT:  Okay.  Take your time.

12          MR. FRIEDLANDER:  In addition to that, you

13  know, we're dealing with questions of alleged fraud.

14  Right?  You know, the cases that are cited in my letter

15  brief, your Honor, speak to the fact that, you know, you

16  got to have more than old fashioned common law fraud.

17  They don't show fraud with any kind of criminal intent or

18  criminal pattern, or even identify what this criminal

19  enterprise is to show that it was distinct and separate

20  from the work that was being done under the various

21  agreements that my client contracted for with 160, I'm

22  sorry, Red Hook 160 LLC.

23          There's no showing in my mind of any predicate

24  that's necessary for a RICO action.  You know, the mail

25  fraud here, I mean what are we talking about?  That my

6

Proceedings

1    client sent invoices?  I don't know how that's evidence

2    of fraud.  The issue is going to be whether or not the

3    work was actually done.  I take the position the work was

4    done.  How else do they think they get the temporary

5    certificate of occupancy if the work wasn't done?  So I

6    don't believe that they can show any kind of actionable

7    fraud.  And there are no specific allegations in the

8    complaint as to the type of fraud they're relying upon.

9    You know, it's just very broad strokes.

10            The other piece of this --

11           THE COURT:  Could you focus on for me, could

12   you focus on the two RICO charges and specifically your

13   views on whether there's closed-ended continuity, open-

14   ended continuity?

15           MR. FRIEDLANDER:  I was just going to get to

16   that.  I'm sorry.

17           THE COURT:  Good.  No, that's good.  Go ahead.

18           MR. FRIEDLANDER:  I was going to say look,

19   we're dealing with a situation.  In the complaint,

20   there's an allegation of a period of six months.  Okay?

21   And you know, from January I believe 2019 to June 2019.

22   And they did some unspecified work in November.  The

23   cases that are cited in my papers, when you talk about a

24   closed end pattern, the courts have recognized, you know,

25   anything less than two years is legally insufficient, and

7

Proceedings

1 the cases that I cited in my letter briefs document that.

2 So that's my position.

3          I don't know how we can have a RICO claim for a

4 six-month period when the cases don't support it.

5          THE COURT:  Thank you.  Is there anything else

6 you want to raise?  If not, I'll ask Mr. Winikow.

7          MR. FRIEDLANDER:  No.  I mean I think, your

8 Honor, those are the salient points I would like to make.

9          THE COURT:  Thank you.  Mr. Winikow?

10          MR. WINIKOW:  Your Honor, I echo much of what

11 Mr. Friedlander said.

12          With regards to the lack of standing, there's

13 no privity, there's no functional equivalent of privity

14 for lack of a better word.  The plaintiff is a third

15 successor in interest to a construction loan.  They have

16 absolutely no relationship whatsoever to my client, to

17 CRI, who my client was retained by.  They have absolutely

18 no standing here whatsoever.  They weren't even formed I

19 think until after these alleged acts even took place.

20 I'm not exactly sure when they were formed but I believe

21 that they were formed afterwards.  But there's absolutely

22 no relationship between my client and the plaintiff, and

23 the plaintiff is a third successor and didn't even own a

24 property interest in the property.

25          What happened here I believe they didn't do

8

Proceedings

1  their due diligence when they acquired the loan.  They're

2  just trying to use this as a vehicle to try to recover

3  some of their construction expenses.  They didn't do

4  their due diligence.  That does not equate to a claim.

5       With regards to my client, your Honor, my

6  client was a consultant that was brought into the project

7  solely to assist in getting the temporary certificate of

8  occupancy which was accomplished back in I think the end

9  of October, 2019.  This was done to get the owner of the

10  property, that Red Hook entity, the temporary certificate

11  of occupancy so they can start closing on units and

12  generating revenue.  Everyone knew that work needed to be

13  done.  They get a temporary certificate of occupancy.

14       They did their job, they did what they were

15  supposed to do for Red Hook.  There was absolutely no

16  predicate acts against my clients that are alleged in the

17  complaint.  You need the predicate acts.  There's no

18  allegation of any predicate acts against my client.  In

19  fact, my client is only named in 15 paragraphs out of

20  this 200 plus paragraph complaint, and most of those

21  paragraphs just describe who they are.  They describe my

22  client as the architect of record for the project.  He

23  wasn't.  He was a consultant that was brought in to

24  assist in getting the temporary certificate of occupancy.

25  There's utterly absolutely no basis for the RICO claims,

9

Proceedings

1    there's no basis at all for any fraud claims against my

2    client.  So we would respectfully ask to file a motion to

3    dismiss.

4           THE COURT:  Thank you.  And is it Mr. Kataev?

5    Am I pronouncing that correctly?

6           MR. KATAEV:  It's Kataev, but Mr. Mauro will be

7    speaking.

8           MR. MAURO:  Thank you, your Honor.  So a couple

9    of points.

10          On the standing issue, I agree with the co-

11   counsel in this case or the co-defendant counsel.  You

12   know, there is no privity.  This entity was created

13   clearly after the alleged unlawful events and alleged

14   predicate acts.  So I think there's a -- I think that

15   threshold issue is insuperable.  I think it requires

16   dismissal of this complaint.  And there's nothing that an

17   amended complaint can do to change that time line.

18   That's one of the main points on standing.

19          The other issue I have with standing, Your

20   Honor, and I want to call your attention to this now

21   rather than putting it in a letter about this, and it

22   goes to the allegations in the complaint with respect to

23   lender -- it's this heading in there complaint starting

24   at page 8 and going into page 9.  It's called lender

25   provides financing to the project, and they talk about

10

Proceedings

1  this, plaintiff talks about, you know, a series of

2  assignments of agreements and the right to title and

3  interest in the mortgage loan and all other rights.  So

4  essentially, at least as I read it, plaintiff is saying

5  that this Red Hook 160 assigned its loan to an entity and

6  then that entity assigned that loan and all of its

7  rights.  So when you read all of that, that's how you get

8  to the plaintiff in this case.  Right?  I guess there are

9  mortgage loan agreements and other documents assigned to

10  this plaintiff.

11        But here's the problem.  The Red Hook 160

12  entity commenced an action in state court, a petition for

13  a lien itemization.  They filed that, I don't know, a

14  couple of months ago.  Do you recall when?  We opposed,

15  Strikeforce and Manda opposed that itemization.  And one

16  of the arguments we raised is saying, you know, how is it

17  that Red Hook 160 is in state court claiming a right for

18  a petition on an itemization but then we're in federal

19  court with this JGIAP entity that's stating that it took

20  an assignment of all sorts of agreements and rights.

21        So at least as I see it, how can JGIAP in this

22  forum claim that it has the right to enforce rights that

23  were assigned to them from this Red Hook 160, but Red

24  Hook 160 is maintaining a cause of action that it retains

25  some right on its own in state court?

                                                                    11
                            Proceedings

1          So you know, it's a quizzical situation for me

2    right now as to were these rights assigned or were they

3    not?  So I just wanted to raise that with the Court now

4    because we're probably going to have to flush that out

5    further in a motion.

6             And with respect to the substance of these RICO

7    claims, you know, I'd like to call the Court's attention

8    to a case that the plaintiff cited in its pre-motion

9    letter which to me is just curious because it absolutely

10   forecloses their own RICO claims.  And it's this *Sky Med.*

11   *Supply Inc. v. SCS Support Claims*, 17 F.Supp.3d 207 (EDNY

12   2014).  You know, and it's clear as day.  And the other

13   counsel that spoke before me said it.  It's quite clear.

14   In the Second Circuit, any act that are less than two

15   years is, from the start is a non-meritorious RICO claim.

16   There are no facts in this world as pled or anywhere else

17   that any of these alleged predicate acts occurred

18   anything more than looks like maybe at most eight months

19   at max, and that's giving them the benefit of the doubt.

20   So to me this case ends right there based on their own

21   cases that they cited.

22             And you know, I would note, your Honor, that

23   especially in that *Sky Med* case, it quotes a Second

24   Circuit case.  You know, it essentially gets to the point

25   that I raise in my pre-motion letter.  And your Honor,

Proceedings

1  you've probably seen this a lot.  You know, these RICO

2  claims, these civil RICO claims, it's just a weaponized

3  litigation tactic to try to bully another party to pay.

4  You know, and they get branded with this scarlet letter.

5  You know, a search of any court docket will bring up this

6  RICO case.  You know, my client has an Italian-American

7  last name, so it's a pretty transparent strategic move

8  here by this plaintiff.  And --

9          THE COURT:  Let me interrupt you for one moment

10  just to pick up on something you had said a moment or so

11  ago about the time frame.

12          MR. MAURO:  Yeah.

13          THE COURT:  I believe in the context you're

14  talking about the case that you mentioned, I believe

15  you're talking about closed-ended continuity.  What's

16  your argument with respect to open-ended continuity?

17          MR. MAURO:  Right.  Hold on a second, your

18  Honor, please.

19          THE COURT:  Sure.

20          MR. MAURO:  Right.  So with respect to the

21  open-ended pattern of continuity, this is one of those,

22  you know, classic cases where it's an inherently

23  terminable scheme.  Right?  Or alleged scheme.  So

24  anything less than this two year time frame or shorter

25  time frame -- let me back up.

Proceedings

1      It's an inherently terminal scheme is what
2  they've alleged.  Not that we're agreeing to that, but
3  that's what they've alleged.  And in the case that I
4  cite, the Second Circuit case, the *Cofacredit, S.A. v.*
5  *Windsor Plumbing*, that a year long mail and wire fraud
6  scheme was insufficient for an open-ended continuity
7  scheme.  It was nothing more than a discrete and
8  relatively short-lived scheme to defraud a handful of
9  victims.  So even assuming, you know, the truth of what's
10  been alleged, as alleged, they're talking from I think
11  December 2019 to at max June 2020.  Then a break in time,
12  and then one other month or two.  So you're far below
13  what any of the cases in the Second Circuit permit for
14  even an open-ended pattern of continuity.
15      Additionally, problematic for -- well, I think
16  dispositive for the plaintiff here, is that there has
17  to -- that they fail to allege an open-ended continuity
18  based upon predicate acts that imply a threat of
19  continued criminal activity that is inherently unlawful.
20  And that inherently unlawful is, you know, you put that
21  term in quotes, and that comes from, you know, the Second
22  Circuit.  And the Second Circuit has repeatedly found
23  that this type of, you know, simple fraud, which is
24  exactly what they're alleging here, does not fit the
25  definition of something that's inherently unlawful.  So I

14

Proceedings

1    think that there's multiple problems here with respect to

2    the open-ended continuity, the temporal component and

3    this inherently unlawful goal component that the Second

4    Circuit says that simple fraud is insufficient.  You

5    know, they're not talking about a scheme of murder and

6    extortion which gets to a point, your Honor, that I was

7    just about to hit upon on that *Sky Med* case that I

8    mentioned earlier cited by the plaintiff.

9           In that case, they cite a Second Circuit case

10   that really gets to the essence of these RICO claims and

11   what congress, what was in congress's mind when they

12   allowed a civil cause of action for it.  And this is a

13   quote, "That congress was concerned with long-term

14   criminal conduct."  It's just simply not here.  This is a

15   discrete closed loop of even if you're going to assume

16   for purposes of a motion that it happened, it's just

17   simply insufficient under the case law.  And the cases

18   cited by the defendant actually highlight and underscore

19   these particular truths with respect to the case law.

20          So based upon all of this, I think the

21   insuperable fatal flaws on standing, that there's no

22   ability to allege an open-ended continuity and there's no

23   ability to allege closed continuity that would be

24   sufficient against the overwhelming case law in the

25   circuit.  Thank you.

Proceedings

1        THE COURT:  And if there's the allegation that

2   the fraud was a regular way of doing business, how does

3   that weight into your argument, or factor into your

4   argument?

5        MR. MAURO:  Right.  So thank you, your Honor.

6   So they actually have no ability to allege a regular way

7   of doing business with respect to my client.  And

8   curiously on that point, I noticed in the complaint how

9   they dig up some old history about one of the other

10  defendants.  What's his name?  Touraj Naghieh?

11       MR. FRIEDLANDER:  My client.

12       THE COURT:  Naghieh?  And I'm not sure if I'm

13  pronouncing that right, but is that who you're referring

14  to?

15       MR. MAURO:  Right.  And they --

16       MR. FRIEDLANDER:  It's my client.

17       MR. MAURO:  Right.  They throw it out there.

18  They're saying oh this guy, you know, is a crook from

19  back in the day with all of these other issues that he

20  was involved in.  Well, there's none of that with respect

21  to my clients.  Nothing.  They're saying oh well, they've

22  done it in this case or this is how they've done it, you

23  know, on some other project.  They simply haven't been

24  able to allege any type of -- that type of activity.

25            So you know, again, your Honor, just to come

16

Proceedings

1   full circle, I mean the RICO claims here are it's just a

2   bully tactic, this is nothing more than brand my clients

3   with a scarlet letter, and quite honestly the other ones,

4   so they can avoid -- they can, you know, pull the rip

5   cord and try to get out of this.

6           And your Honor, one thing I'm going to say on

7   this call that prior to the filing of this lawsuit, my

8   clients and I think it was representatives of this

9   Churchill entity, 160 NY Lender I believe.  I don't know

10  if it's 100 percent.  It was some people, they sat in a

11  room and I wasn't there, and there were no lawyers on

12  behalf of Manda, talking about resolving this thing.  And

13  there were no issues raised about RICO claims.

14          So this whole thing is just a complete house of

15  cards and it should not be in a federal courthouse.  This

16  is not the type of real RICO case that you're talking

17  about that's used as a tool against organized crime.

18  This is just being completely disfigured in order to

19  really, really brand my clients with something that they

20  shouldn't be branded with.

21          THE COURT:  You referenced the state court

22  proceeding involving I believe you said Red Hook 160.

23  Are you making an argument, an abstention related

24  argument here on that ground?

25          MR. MAURO:  Yes, your Honor.  Thank you for

17

Proceedings

1   saying that because in realizing what's going on --

2          THE COURT:  Well, I'm simply asking you a

3   question.  So I just want to get your position on that if

4   that's what you're raising here.

5          MR. MAURO:  Yes, Your Honor.  I'm raising

6   abstention and I didn't raise it articulately enough, but

7   that's precisely what I am.  And as a matter fact, Your

8   Honor, and I'll bring this to the Court's attention with

9   a letter or I can do it in a motion, the response by the

10  Red Hook 160 in that state court action essentially says

11  what are you talking about?  You know, we didn't assign

12  all rights.  You know, so it's like well, the plaintiff

13  in the federal case is saying these rights were assigned.

14  So why am I in federal court now dealing on a RICO claim

15  when this underlying entity is saying no, I have a

16  dispute with your lien?  It just doesn't -- there's

17  something that's completely mutually exclusive.

18          So this Court should be abstaining from even

19  deciding anything if Red Hook is in state court trying to

20  enforce some right.  Who has the right to proceed here?

21  Red Hook apparently says they have the right.  So why am

22  I in federal court defending a RICO claim.  I think this

23  Court should not be deciding anything and we should just

24  be in state court.

25          THE COURT:  Let me turn back to Mr. Friedlander

Proceedings

1    for a moment because your individual client's name came

2    up just a moment ago and I want to get your view on

3    whether any prior litigation related to him is relevant

4    here.

5            MR. FRIEDLANDER:  Well, your Honor, I think

6    that it's not relevant and I think that it's inflammatory

7    and it's really a distraction from the fact that they

8    have not pled the necessary allegations to show a RICO

9    case.

10           The fact that my client may have been involved

11   in prior litigation in another jurisdiction has nothing

12   to do with the fact that they were contracted to do

13   certain work and they delivered on the contract.  They

14   got the temporary certificate of occupancy that they were

15   required to get.  So you know, the allegations that my

16   client may have been involved in something in

17   Massachusetts is irrelevant to the facts of this case.

18           And it's a red herring, it really is.  And you

19   know, I take umbrage at it because it doesn't show

20   criminal intent in the facts that are alleged or quasi-

21   alleged in the complaint by this plaintiff.

22           THE COURT:  Thank you.  I'm going to turn to

23   Mr. Wilson now to hear his response, and I'd like him to

24   address of course the standing issue as well as the

25   abstention issue that was just raised, as well as the

Proceedings

1  deficiency of his allegations.  And I want to focus on

2  the RICO counts, please.

3          MR. WILSON:  Yes.  Thank you, your Honor, and

4  good afternoon.

5          Obviously we have a variety of defendants'

6  counsel who have made a variety of arguments, so I'm

7  going to try to parse out each one of those arguments and

8  take them in turn.  And if your Honor has any specific

9  order that you would like me to address them, I'd be more

10 than happy to do so.

11         THE COURT:  No, I don't.  You can organize it

12 as you feel is appropriate.

13         MR. WILSON:  Sure.  Thank you, your Honor.

14         As far as the standing issue goes, I think it's

15 fairly simple.  The current plaintiff that I represent

16 has had an assignment of rights that has been handed down

17 multiple times through multiple entities and now resides

18 with my client.  And I don't think that there's any

19 question that that gives them standing to bring this

20 case.

21         As far as the abstention issue in the state

22 court matter, this is the first I'm hearing of that.  It

23 was not reused in any of the pre-motion conference

24 papers.  I'd be more than happy to address that more

25 fulsomely in a full briefing.  But this right now is the

20

Proceedings

1   very first time any defendant has raised that issue.  So

2   I'm more than happy to address it, but I just wanted to

3   raise for the Court that this is the first time that any

4   defendant has raised that issue.  So I'm happy to address

5   it but --

6           THE COURT:  Let me just ask you, and I'm going

7   to obviously let you get to the rest of your argument --

8           MR. WILSON:  Yes, your Honor.

9           THE COURT:  -- but let me ask you, because you

10  said this is the first time you've heard this, have the

11  parties been having any discussions with each other about

12  possibly talking about mediation or settlement here?

13  Where does that --

14          MR. WILSON:  No, your Honor.  And this is an

15  interesting issue because -- and this is something that

16  probably more towards the end of the discussion that I

17  was going to raise this.  But I attempted to reach out to

18  the parties for a scheduling conference pursuant to Rule

19  26 which of course we're all mandated to do.  And I

20  reached out to each of the defendants and each of the

21  defendants responded to me that they refused to engage in

22  those discussions because of their belief on the strength

23  of their motion to dismiss.  I wanted to have discussions

24  along those lines with the defendants, discussions about

25  potential settlement or the way that discovery would

21

Proceedings

1   proceed, and each defendant in writing told me that they

2   refused to engage in such discussions.

3          So I would have been more than happy to engage

4   in those sorts of discussions but those discussions were

5   rejected by all defendants.  So that's where it stands as

6   far as mediation or arbitration or settlement resolution.

7          THE COURT:  Okay.  Go ahead.  And I may ask

8   your adversaries a bit more about this but I don't want

9   to cut you off in your argument.

10         MR. WILSON:  Sure.  Of course.  I want to make

11  sure that I'm answering the Court's questions and what

12  they're interested in.

13         But it's of course our position that we have

14  more than adequately alleged the elements of RICO.  The

15  first point that I want to make because the defendants

16  have what I would argue have submitted a red herring

17  argument that there is a heightened standard for RICO.

18  There is not.

19         As the Court I'm sure is aware, there are two

20  standards for a motion to dismiss, Rule 8 and Rule 9(b).

21  There is no such thing as a heightened standard for RICO

22  allegations.  And Rule 9(b) itself only applies to very

23  specific aspects of fraudulent conduct, and that is the

24  fraudulent statement.

25         We have more than adequately alleged the

22

Proceedings

1   conduct here.  The conduct is actually fairly simple.

2   CRI and Mr. Touraj were brought into an incredibly

3   significant commercial construction project and they were

4   brought in to remedy the deficiencies that had occurred

5   in that project up to that point.  Mr. Touraj on behalf

6   of CRI then conspired with the Moralis and Manda and

7   Strikeforce as Manda's subsidiary in order to

8   consistently defraud the project out of millions and

9   millions of dollars.  There was what is called a

10  guaranteed maximum price contract under which there is a

11  maximum price that the project cannot exceed.  And if it

12  does, that risk is laid out to the contractor.

13          There are certain ways that that price can be

14  exceeded.  One of those ways is something a change order

15  which essentially means that something needed --

16  something we did not anticipate needed handling  and

17  therefore, a requisition form is put in place so that

18  there will be an additional amount of money paid in

19  addition to what the guaranteed maximum price was.

20          So the allegations in our complaint which are

21  incredibly detailed, incredibly detailed, suggest, state,

22  and prove that Manda and with the help of the Moralis and

23  with the ultimate approval of CRI and Mr. Naghieh

24  approved numerous change orders for work that was never

25  done, for work that they said was necessary and therefore

23

Proceedings

1    paid, and it simply did not happen.

2          THE COURT:  Could you identify for me the first

3    predicate act and the last predicate act that you're

4    alleging and give me the dates?

5          MR. WILSON:  So I can follow up with the

6    specific dates.  I don't have them in front of me right

7    now.  But the predicate acts were the construction

8    alleged to be necessary and the requisition forms that

9    were submitted for payment.  That's simply did not occur.

10          THE COURT:  I'll take even an approximate date

11   though.  I'm trying to get the time frame understood

12   better here.  So give me --

13          MR. WILSON:  I can --

14          THE COURT:  -- the early date and the later

15   date even if you don't have the exact dates on you now.

16   Can you give me a sense of the month, year?

17          MR. WILSON:  I apologize because I had this in

18   front of me but --

19          THE COURT:  Take a minute to find it.

20          MR. WINIKOW:  Your Honor, this is Scott

21   Winikow.  Can I just say something while Mr. Wilson is

22   looking?

23          THE COURT:  You may.

24          MR. WINIKOW:  Just with regards to the standing

25   issue and the assignment issue, looking at the complaint

24

Proceedings

1   in paragraph 31, and obviously I don't have the

2   agreement, but it states -- and it doesn't say -- it's

3   not this broad assignment of every single claim.  But the

4   agreement that's alleged to say says pursuant to the

5   assignment agreement, RH 160 did assign to original

6   lender and all of original lender's successors and

7   assigns quote, "All plans and specification for any work

8   performed at the premises and all other agreements

9   (including but not limited to those with architects,

10  contractors, construction managers, suppliers, and the

11  like) plans and specifications and records relating to

12  the construction, development, use, ownership, operation,

13  or maintenance of the project."

14          He's talking about a fraud claim.  A fraud

15  claim is not a contract.  A fraud claim is not plans and

16  specifications.  There's no assignment of this claim that

17  he's trying to allege under his own pleading.  So I

18  thought that was an important point that I did want to

19  raise with the Court.  There is no assignment.  He has no

20  standing.

21          THE COURT:  Okay.  Thank you.  I'm just going

22  to wait on Mr. Wilson.

23          MR. WILSON:  Yes.  So your Honor, and again, I

24  can certainly follow up with the Court, but in paragraph

25  36 you can see that April 12, 2019 was when CRI entered

25

Proceedings

1  into the project advisory services.  And we would submit

2  that the damages and the conduct continues even, you

3  know, the repercussions continue even to today.

4  THE COURT:  But what are the specific acts that

5  continue to today or to recently?  I mean you have to

6  allege predicate acts, right?  Under RICO.  So I'm trying

7  to pin down here what are the predicate acts that you

8  want to be relying on here and want me to rely on when

9  I'm --

10  MR. WILSON:  Well, the predicate, I mean I'm

11  happy to walk through the complaint.  I mean it's

12  obviously very detailed, but --

13  THE COURT:  No, but I'm just asking you.  I

14  have the complaint and I've read the complaint.  What I'm

15  asking you though is what's your latest predicate act

16  that you're alleging?

17  MR. WILSON:  I would suggest that June of 2020

18  was at a minimum the last time that we received a

19  fraudulent requisition.

20  THE COURT:  Okay.  Thank you.  And I'll ask you

21  the question that I asked to Mr. Friedlander about his

22  individual client's prior litigation and how if at all is

23  that relevant here in your view?

24  MR. WILSON:  I'm sorry, the state court

25  litigation that he suggested?

26

Proceedings

```
 1          THE COURT:  No, no.  Mr. Naghieh's prior
 2   litigation history.
 3          MR. WILSON:  I'm sorry, Your Honor, I am not
 4   understanding the question.
 5          THE COURT:  We just had some discussion I had
 6   with your adversary about whether or not Mr.
 7   Friedlander's individual client's prior litigation in
 8   other contexts is relevant here and he argues that it's
 9   not, that it's inflammatory, et cetera.  I just want to
10   understand your view.
11          MR. WILSON:  Yeah.  Oh, I apologize.  No, I
12   haven't raised in any format, I have not raised the issue
13   of any other litigation, so I don't believe it could be
14   relevant at all.
15          THE COURT:  Thank you.
16          MR. WILSON:  So I don't -- would your Honor
17   like me to move on to the continuity issues?
18          THE COURT:  Yes, please.
19          MR. WILSON:  So it's our belief and
20   respectfully submit that we have easily satisfied both
21   closed and open-ended continuity.
22          With regard to closed-ended continuity, we
23   obviously acknowledge the cases that talk about the two
24   years, but there's no case that suggests or states that
25   two years is a black line number that has to be
```

27

Proceedings

1   satisfied.  We have cited in our papers a number of cases

2   that were well below two years.  There was one that was

3   nine months.  And so there is no bright line test for

4   closed-ended continuity.  There simply isn't.  The Court

5   will be able to see that very easily.

6           As far as open-ended continuity goes, we would

7   submit that we very easily satisfy that test.  What our

8   allegations make clear is that the entire crux of the

9   scheme that the defendants put in place was to keep this

10  project going in perpetuity so that it essentially was a

11  never ending cookie jar of money from which they could

12  siphon for their own personal gain.  And so by the very

13  definition of open-ended continuity, that conduct

14  satisfies it because --

15          THE COURT:  In the cases though where there's a

16  shorter period of time at issue, don't those cases tend

17  to typically have more complex schemes there than here?

18          MR. WILSON:  I'm sorry, Your Honor.  Are we

19  talking about closed or open-ended?

20          THE COURT:  For the shorter period, for the

21  closed period.

22          MR. WILSON:  I'm sorry, could you repeat the

23  question?

24          THE COURT:  For the cases where you have --

25  you're looking at closed continuity and there's a shorter

28

Proceedings

1   period of time, are those cases typically involving more

2   complex schemes than the one alleged here?

3          MR. WILSON:  I don't think so.  I mean well

4   first of all --

5          THE COURT:  Tell me why not.

6          MR. WILSON:  Well, I don't -- well, first of

7   all, I would not suggest that this was a simplistic

8   scheme.  I think that this is a, you know, I think that

9   this is a scheme that was multilayered with an architect

10  and a general project manager and a contractor and

11  subcontractors.  I don't believe this to have been

12  necessarily a simplistic scheme.  So to the extent that

13  the cases could be read as having more complex schemes, I

14  would submit that this is not all that afar from that.

15  This is not a situation where one single entity defrauded

16  my client.  This is a multilayered scheme of several

17  different entities that worked in concert to defraud my

18  client.  So I don't view this as simplistic.

19         THE COURT:  Okay.  Thank you.

20         MR. WILSON:  I think that --

21         THE COURT:  So let me just ask you to take a

22  look at paragraph 141 of your complaint for a moment.  I

23  think you have a typo there and I just want to flag that

24  for you.  You're making reference to the year 2000.  Is

25  that what you intended to do there?

29

Proceedings

1          MR. WILSON:  Yeah, I apologize, your Honor.

2          THE COURT:  Could it be 2020?

3          MR. WILSON:  What paragraph is that?

4          THE COURT:  141.

5          MR. WILSON:  Yes, Your Honor.  I apologize.

6  Yes.  We can submit a revised document.

7          THE COURT:  What is it 2020?  Is that the

8  correct year that you intended to allege or something

9  else?

10          MR. WILSON:  Yes, your Honor.

11          THE COURT:  2020.  Okay.  Is there anything

12  else you want to raise with me at this time?  If not, I'm

13  going to turn back to your adversaries for a moment.

14          MR. WILSON:  No, your Honor.

15          THE COURT:  Actually, before I turn back to

16  them, let me ask you one more question, Mr. Wilson.

17  Given the nature of the construction project here, isn't

18  it the situation where you have the inherently terminable

19  scheme?

20          MR. WILSON:  No, your Honor.  I don't think so

21  because what I believe that we -- what we allege, and I'm

22  positive adequately, is that what the scheme here was was

23  that they, they being defendants, would continue to

24  essentially drag their feet in perpetuity.  They wanted

25  to make sure that this was a continuous source of revenue

30

Proceedings

1   as long as they could conduct the scheme.  If they had

2   their druthers, they would never complete the project.

3   So that was the scheme as they contrived.

4           THE COURT:  Okay.  Thank you.  Let me turn back

5   counsel for the various defendants here.  And I want to

6   start with something that Mr. Wilson had mentioned about

7   efforts to talk about mediation or settlement here.  And

8   I want to get your positions on what the history has been

9   there and whether there is an interest in having further

10  discussions.  So let me start with you, Mr. Friedlander.

11          MR. FRIEDLANDER:  If I may, your Honor.  I

12  don't know if Mr. Wilson doesn't remember, but when he

13  sent the email to me, I responded positively to him and I

14  said I would be more than willing to entertain that

15  conference.  And then I started seeing all the other

16  emails from all the other defendants and I was the only

17  one standing by myself saying that I would agree to this.

18  So I was just waiting to see what everyone else was going

19  to do.  You know, I always believe in talking.  I always

20  believe that conversation could lead to some kind of

21  settlement that's worthwhile for everybody.  I would

22  never close the door on that.

23          THE COURT:  Thank you.

24          MR. KATAEV:  Your Honor --

25          THE COURT:  Mr. -- sorry, go ahead.  Who is it

Transcriptions Plus II, Inc.

31

Proceedings

1   speaking?

2           MR. KATAEV:  Your Honor, this is Mr. Kataev

3   speaking on behalf of Manda, Strikeforce, and Mr. Corrao.

4           I'm looking at the email correspondence now

5   dated July 6th and it refers to scheduling a Rule 26

6   scheduling conference.  Within the correspondence, which

7   is very short and I could read it into the record if

8   necessary, there is nothing about settlement.  We

9   responded to that by stating that we don't believe that

10  we should be moving forward with discovery because we

11  submit that the motion to dismiss will be meritorious.

12  If at that point the plaintiff wished to discuss

13  settlement, he did not make that clear.  He did not

14  respond to that.  So you know, our position is that

15  settlement discussions were never broached.  The

16  correspondence was solely focused on a Rule 26

17  conference.

18          MR. WINIKOW:  Your Honor, this is Scott

19  Winikow, and I echo what the attorney for Manda said.

20  The email was solely for the purpose of scheduling a Rule

21  26 scheduling conference.  A proposed scheduling order

22  was sent with that.  There was absolutely no discussion

23  about whether or not we wanted to settle, mediate

24  whatsoever.  Right now this is the first time that issue

25  has been raised and that's something that I would need to

32

Proceedings

1   discuss with my client, so I don't want to discuss --

2          THE COURT:  Certainly.  No, I understand that

3   certainly.  Okay.  Well, it sounds like there's some, at

4   the very least, there has been some miscommunication or

5   perhaps just talking past each other.  I think it would

6   be very useful for the parties to talk to each other at

7   least in the first instance to even decide whether

8   there's an interest in possibly mediating or having a

9   settlement conference before the magistrate judge here.

10  It does seem to me that there are issues which maybe the

11  parties can make some headway on if they talk to each

12  other.

13         There's also this issue of the possible

14  abstention issue.  And I think the parties really need to

15  talk to each other.

16         So I am going to ask for the parties to talk to

17  each other, discuss whether or not they want to be

18  referred to mediation, they want to have a settlement

19  conference, or at least have some discussions with each

20  other about settlement for some period of time.  I think

21  it would be productive to do that before I set any

22  briefing schedule on these anticipated motions.

23         So I am going to give the parties two weeks to

24  put in a joint letter, one letter from everybody, letting

25  me know whether you want to pursue mediation or

33

Proceedings

1  settlement, and if there's anything you want to bring up

2  in that regard -- I don't want a full motion on the

3  abstention issue, but if there is something there that

4  maybe that you need more time to look into that issue

5  before you decide how you want to proceed here in this

6  case.  So I'm going to ask for a joint status letter on

7  these issues by two weeks from today which is September

8  17th.  And I'm going to hold in abeyance your request to

9  have a briefing schedule on the motion to dismiss.

10              MR. MAURO:  Your Honor?

11              THE COURT:  Yes?

12              MR. MAURO:  Your Honor --

13              THE COURT:  Tell me who's speaking.  Tell me

14  who's speaking.

15              MR. MAURO:  Sure.  This is Michael Mauro for

16  the defendants Manda, Strikeforce and Angelo Corrao.  It

17  may make sense, Your Honor, trying to get quick closure

18  on that abstention issue one way or the other is to be

19  provided now and have plaintiff provide the defendants

20  with these documents referenced in paragraphs 30 to 33,

21  you know, because in that state court litigation, RH 160,

22  Red Hook 160 says what are you talking about, Manda?  We

23  didn't assign everything.  So these documents should just

24  be provided so we can see one way or the other and that

25  could potentially get right to the bottom of the issue.

34

Proceedings

1          THE COURT:  So as I said, I think the parties

2   should speak to each other and this may be one of the

3   issues you want to lead with when you speak to your

4   adversary and your other defense attorneys involved here.

5   I'm not going to get into that issue and that level at

6   this conference.  It's not the purpose of this

7   conference.  But I do hear you that there is more that

8   needs to be discussed on that particular issue.

9          So again, I'm going to set a deadline of two

10  weeks from today for the status letter I just described

11  and as I said, it's September 17th.

12          ALL:  Thank you, your Honor.

13          THE COURT:  Thank you.  And we will adjourn for

14  today.  Thank you.

15          ALL:  Thank you, your Honor.

16                  (Matter concluded)

17                      -oOo-

18

19

20

21

22

23

24

25

35

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **8th** day of **September**, 2021.

*Mary Greco*

Transcriptions Plus II, Inc.