# Exhibit "A"

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JGIAP RH 160 LLC<br><br>     Plaintiff,<br><br>  vs.<br><br><br>CRI HOLDING CORP., TOURAJ NAGHIEH, MORALI AND ASSOCIATES, ANTHONY MORALI, JOSEPH MORALI, MANDA INTERNATIONAL CORPORATION, STRIKEFORCE MECHANICAL CORPORATION, AND ANGELO CORRAO<br><br>     Defendants. | Case No.<br><br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff JGIAP RH 160 LLC ( "Lender"), by and through the undersigned attorneys, for its Complaint against defendants CRI Holding Corp. ("CRI"), Touraj Naghieh ("Naghieh"), Morali and Associates ("Morali"), Anthony Morali, Joseph Morali (the two together, the Moralis), Manda International Corporation ("Manda"), Strikeforce Mechanical Corporation ("Strikeforce"), and Anthony Corrao ("Corrao") (collectively, "Defendants"), alleges as follows:

## SUMMARY OF THE ACTION

1. Red Hook 160 LLC ("RH 160") is the owner and developer of a luxury condominium project (the "Project") located at 160 Imlay Street, Brooklyn, New York (the "Property").

2. After a series of construction delays plagued the Project, Plaintiff retained Defendant CRI as its owner's representative to execute on RH 160's design plans and represent the interests of RH 160 in respect of completing the Project. CRI's president and principal

equity holder, Naghieh, represented that he was an experienced construction manager who would analyze the "entire" scope of the Project and provide boots on the ground support for the RH 160. Among the promises made by Naghieh were that he would review all proposed subcontractors, supervise the day-to-day construction at the Project, and review and make recommendations on all requisitions for payment. CRI reported to have assembled a team of professionals to serve the Project, including the Moralis. CRI received a monthly fee for its services.

3. Recognizing that his pecuniary interests were best served by the Project extending indefinitely, Naghieh sought out contractors that could assist him in delaying the completion of the Project. Naghieh brought in the Moralis to assume the role as day-to-day architect. Naghieh further permitted Manda, the alter ego of Strikeforce -- one of the Projects' subcontractors – to be retained as Construction Manager. This team together perpetrated a massive fraud on the Project and Lender.

4. Separate and apart from each of their fraudulent actions, each Defendant permitted a plethora of breaches of the various contracts between the conspirators and RH 160. CRI had a contractual obligation to, inter alia, assist RH 160 by "continually monitor[ing] the progress of work and the projects overall adherence to the approved budget and schedule." CRI was further obligated to "review[] and recommend[] approval or disapproval of all invoices submitted, and payment applications and change orders, including documentation of any 'time and material' work."

5. CRI's responsibilities were later increased to provide a "continuous daily presence on site." CRI further agreed to "[c]ontinuously daily observe all Trades, including the General Contractor and all its subcontractors on the progress of all work performed." CRI

breached its agreement. Under CRI's "supervision" trades were permitted to perform shoddy work at random intervals. Moreover, the Project fell even further behind and impossibly over budget. Indeed, in the nearly eighteen months that CRI and Naghieh served as "owner's representative" the Project languished, making superficial progress only where it would benefit Naghieh.

6. The rampant breaches of contract were not confined only to CRI. Manda was retained as the Construction Manager, to complete the Project, pursuant to the CM Agreement, defined below. The CM Agreement provides that Manda was to supervise all construction and remediation at the Project. The CM Agreement further capped the total amount the RH 160 was to spend in regards of the scope of work provided by Manda (which consisted of remediating and completing the bulk of the units at the Project). The CM Agreement, which was prepared by Strikeforce, set the Guaranteed Maximum Price, for Manda's completion of the Project, as defined in the CM Agreement, at $2,064,500.

7. The CM Agreement provides, in pertinent part, that "the extent the Cost of the Work exceeds the Guaranteed Maximum Price, the Construction Manager shall bear such costs in excess of the Guaranteed Maximum Price without reimbursement or additional compensation from the Owner." Costs of the Work are all costs that are "necessarily incurred" by Manda in the proper performance of the work and include, *inter alia*, subcontractor costs, materials costs, and costs for temporary facilities at the job site. All these costs were to be included in the Guaranteed Maximum Price.

8. The CM Agreement provides that Manda is not permitted to "self-perform" the work at the Project. In order to avoid this contractual prohibition, Manda retained the services of Strikeforce. Strikeforce is an alter ego of Manda. Strikeforce has the same officers, same

directors, same equity, and operates out of same address as Manda. Given the relationship, the CM Agreement provides that Manda's fee does not accrue on amounts incurred by Strikeforce.

9.     With all the pieces in place, Naghieh, the Moralis, Corrao, and Manda/Strikeforce proceeded to run a confidence game at the Project. Naghieh would occasionally visit the Project to ensure that contractors were working and "supervise" Manda/Strikeforce. Manda/Strikeforce would then play a shell game wherein they would "fix" one issue and in so doing create three more that needed to be resolved. The net result of this was that the Project would have the appearance of motion, but would merely be treading water like a swimmer off the deep end.

10.     Manda/Strikeforce's deceptive practices were not limited to its intentionally poor workmanship. Manda and Strikeforce fraudulently inflated their bills by including a series of "change orders" that by their terms seek additional compensation for items that are necessarily included in the GMP. The absolute work of fiction that is Manda and Strikeforce's invoices well exceeded the Guaranteed Maximum Price. All of this was done under the supervision of Naghieh and his "advisors."

11.     While RH 160 and Lender reasonably believed that a competent team was working to complete the Project, the stark reality is that the fox was let into the hen house. Naghieh was a seasoned fraudster, with a history of gaming developers like RH 160. Naghieh was subject to at least two previous litigations arising from his handling of construction-related matters: first for mismanagement of a condo boards' resources by authorizing unnecessary work, and second by artificially extending a construction timeline for an apartment rehabilitation while he lived in the apartment.

12.     The Project was simply Naghieh's next target. Indeed, through the Project, Naghieh was able to marry his prior schemes of misappropriating construction resources and

delaying and defrauding sponsors to create an open-ended construction project that would literally take two steps forward only to take four steps back. Naghieh's scheme was fairly straight forward. CRI would "supervise" work at the Project. Manda would provide additional, overlapping supervision. Manda's alter ego Strikeforce would then claim to perform work, or direct subcontractors to perform work that would be deliberately deficient. CRI would sign off on the work as being completed. Subsequently, CRI would "discover" that some other aspect adjacent to the work was deficient and would authorize Manda and Strikeforce to submit change orders so that they could charge multiple times for the same job.

13. Naghieh benefitted from this scheme in two ways. First, CRI's contract contained an escalating fee structure whereby CRI's monthly fee would increase by hitting certain milestones. Pursuant to the April CRI Agreement, CRI's fee would nearly double if CRI were able to obtain a temporary certificate of occupancy for two thirds of the residential space at the Project. Sure enough, at CRI's direction, with no corner uncut, the Project limped to a TCO just in time to secure CRI's fee increase, only for the Project to stall again.

14. Second, Naghieh benefitted by myriad stoppages at the Project. CRI's agreement permitted it to reap a monthly fee for as long as the Project remained incomplete. Knowing that it could continue this game indefinitely, CRI manufactured a scenario whereby Manda could benefit by fabricating change orders for work that it simply failed to correctly perform in the first instance.

15. Naghieh's fraudulent conduct in conducting this scheme serves as a predicate act in furtherance of his overall criminal enterprise. Naghieh has a history of perpetrating variations using these same methods. Naghieh induced others to participate by permitting them to be paid

multiple times for the very same work. Under Naghieh's "supervision" the Project would pay him $44,000 a month, plus expenses, and would never be completed.

16.     The fraud planned by Naghieh and perpetrated by CRI, Manda, and Strikeforce, was targeted not only at RH 160 but at Lender. In the course of its scheme, CRI would assist its contractors in compiling their fictitious change orders into a requisition that would be sent to Plaintiff's predecessor in interest in order to induce the Lender to release funds held back from its loan. While Lender had a construction consultant engaged to oversee the review of the requisitions and overall progress of the Project, Lender simply could not see behind the walls. It was only after the Project ran out of all funds and required a significant recapitalization that Lender discovered Defendants' fraud. By that time, however, the damage was done as their deception had (i) cost the project millions of dollars, and (ii) jeopardized the value of the Project and thereby suppressed the value of Lender's collateral.

17.     At bottom, Naghieh and his cronies conspired to set the Project up for failure and to bilk both RH 160 and Lender out of as much money as they could take before their game ended. Their deception will require millions of additional dollars to remedy, and the Project remains in serious distress. Plaintiffs are now seeking to hold Naghieh and his co-conspirators liable for the damage their enterprise has caused.

## PARTIES, JURISDICTION, AND VENUE

18.     Plaintiff Lender is a limited liability company organized under the laws of New York. Lender's principal place of business is New York, New York.

19.     Upon information and belief, Defendant CRI Holding Corp. is a Company formed under the laws of the State of New York.

20. Defendant Touraj Naghieh is President of CRI. Defendant Naghieh conducts substantial business in the State of New York.

21. Defendant Manda International Corporation is a Company incorporated under the laws of New York. Manda's principal place of business is in Holbrook, New York.

22. Defendant Strikeforce Mechanical Corporation is a Company incorporated under the laws of New York. Strikeforce's principal place of business is in Holbrook, New York.

23. Upon information and belief, Defendant Anthony Morali Architects PLLC ("Morali Architects") is company formed under the laws of the State of New York.

24. Defendant Anthony Morali is the co-owner of Morali Architects. Anthony Morali is, and all relevant times was, a resident of New York.

25. Defendant Joseph Morali is the co-owner of Morali Architects. Joseph Morali is, and all relevant times was, a resident of New York.

26. Defendant Anthony Corrao is the owner of Manda. Corrao is, and at all relevant times was, a resident of New York.

27. This Court has personal jurisdiction over Defendants pursuant to Civil Practice Law and Rules ("CPLR") § 301 because Defendants are residents of this State, Defendants conduct substantial commercial business in this State, Defendants have purposefully directed economic activity to residents of this State and Defendants have availed themselves of the laws and protections of this State.

28. Venue is proper pursuant to CPLR § 503 because Lender resides within this County.

## FACTUAL ALLEGATIONS

### BACKGROUND OF THE PROJECT

29.     The facts arise out of the renovation and construction of a six-story property containing 70 luxury residential units and a commercial unit located at 160 Imlay Street, Brooklyn, New York (the "Project").  The Project is comprised of five building sections, referred to as "Cores" A through E.

### LENDER PROVIDES FINANCING TO THE PROJECT

30.     On or around December 27, 2019, Churchill 160 Imlay Lender LLC (the "Original Lender"), a New York Limited Liability Company, provided a loan in the original principal amount of $59,000,000 (the "Mortgage Loan") to RH 160 pursuant to that certain Loan and Security Agreement, dated as of December 27, 2019 (the "Mortgage Loan Agreement").

31.     As collateral security for the Mortgage Loan, on or around December 27, 2019, the Original Lender and RH 160 entered into that certain Assignment Of Agreements, Licenses, Permits And Contracts (the "Assignment Agreement").  Pursuant to the Assignment Agreement, RH 160 did assign to Original Lender, and all of Original Lender's successors and assigns, "all plans and specifications for any work performed at the Premises and all other agreements (including, but not limited to, those with architects, contractors, construction managers, suppliers and the like), plans and specifications and records relating to the construction, development, use, ownership, operation and/or maintenance of" the Project.

32.     On or around December 27, 2019, the Original Lender assigned the Mortgage Loan, together with all Original Lender's right, title, and interest in and to the Mortgage Loan Agreement and all ancillary agreements, including the Assignment Agreement, to MAM 160 Imlay Lender LLC ("MAM").

33.     On or around March 10, 2021, MAM assigned the Mortgage Loan, together with all MAM's right, title, and interest in and to the Mortgage Loan Agreement and all ancillary agreements, including the Assignment Agreement, to Lender.

**CRI IS RETAINED AS OWNER'S REPRESENTATIVE**

34.     CRI holds itself out to be a "a full-service boutique real estate firm that handles sales, rentals, marketing, property management and development of real estate properties in New York City."  While CRI's marketing materials do not elaborate on the full suite of its services, the marketing materials do tout its President, Naghieh, as being an engineer who founded his own architecture and design firm in Boston. Other employees listed in CRI's marketing materials have unspecified "project development" experience.

35.     In reliance upon CRI's, and Naghieh's representation that it had the knowledge, skill, and resources to timely and cost effectively supervise the Project and ensure its completion within the approved budget, Red Hook 160 engaged CRI as "Owner's Representative" through the completion of the Project.

36.     On or about April 12, 2019, RH 160 and CRI entered into a written "Project Advisory Services for 160 Imlay Street, Brooklyn, NY. (Block; 515 Lot: 75) a/k/a The New York Dock Building" (the "April 12 Agreement").  Pursuant to the April 12 Agreement, CRI's work was separated into three phases.  First, CRI was to perform "Due Diligence" including, but not limited to: "[a]nalyz[ing] the entire scope of work"; "[r]eview[ing] project plans and specifications"; and "[c]onduct[ing] a thorough site visit and coordinate engineering reports by others.

37.     After completion of its diligence, CRI was next to perform certain "Construction Activities" including "[a]ssist[ing] Client to continually monitor the progress of work and the

Project's overall adherence to the approved budget and schedule"; "[a]ssist[ing] Client with monitoring quality of work and general conformance with project plans, specifications and offering plan"; and [a]ssist[ing] Client to the development team on strategy, field and organizational matters, etc." In performing these tasks, CRI was to visit the site every day.

38.    CRI was also to provide certain additional services including: serving "as liaison of Client on all aspects of the project including financing (in liaison capacity only)"; assisting with "reviewing and recommending approval or disapproval of all invoices submitted, all payment applications and change orders, including documentation of any 'time and material' work." Indeed, CRI had inserted itself into all facets of the construction and payment of the Project.

39.    The CRI Agreement provided that the "team" it had assembled included Anthony Morali and Joseph Morali. The CRI Agreement expressly superseded prior agreements between RH 160 and Morali.

40.    CRI was paid a monthly fee of $44,000. The monthly fee was split into a sliding scale depending on the speed in which CRI was able to secure a temporary certificate of occupancy for the Project. CRI was paid $22,000 per month until "Milestone 1" (i.e., when two of the Cores had completed plumbing sign off, DEP site connection sign off, completed inspections of the rough in plumbing and electric, sprinkler and standpipe sign off, elevator sign off, and fire alarm exception letter was obtained) was achieved. After the completion of Milestone 1, CRI's monthly fee would increase by $8,000 to $30,000.

41.    After completion of Milestone 2 (i.e., granting of TCO for two of the five Cores), CRI's monthly fee would increase to $44,000 per month. CRI would also be entitled to lump sum payment sufficient to "true up" CRI's fee to $44,000 per month retroactive to the date of the

execution of the April Agreement. CRI would continue to earn a monthly fee of $44,000 per month until TCO was granted for the entire building. Once TCO was obtained for the entire Project, CRI and RH 160 were to "discuss in good faith what if any adjustment (up or down0 should be made to the Fee amount."

42.     CRI subsequently sought to increase the scope of its responsibilities, and its fees. On or around July 15, 2019, CRI and RH 160 entered into that certain "Additional Services for 160 Imlay Street, Brooklyn, NY. (Block; 515 Lot: 75) a/k/a The New York Dock Building" (the "July CRI Agreement" and together with the April CRI Agreement, the "CRI Agreement"). Pursuant to the July CRI Agreement, CRI was to increase its presence on site from three days a week to daily supervision. CRI was also supposed to conduct weekly site meetings and liaise between the various contractors and government officials. CRI charged an additional $30,000 per month for these additional services.

**MANDA IS RETAINED AS CONSTRUCTION MANAGER**

43.     As part of CRI's role, CRI was to make recommendations to RH 160 regarding the composition of the contractors and subcontractors presently engaged at the site. Upon information and belief, CRI was unable to control Star Builders ("Star"), the Project's then general contractor, and began taking steps to undermine their credibility. Notwithstanding that Star's subcontractors, under Star's supervision, were able to complete work sufficient to obtain a TCO for up to four Cores well in advance of CRI's schedule, or perhaps because of it, CRI systematically destroyed Star's credibility. As a result of CRI's sabotage, RH 160 was replaced CRI with a new construction manager.

44.     In or around May, 2019, Manda International formed Defendant Strikeforce. On information and belief, Strikeforce was formed primarily to perform work at the Project.

11

Strikeforce is, and was at all relevant times, an alter ego of Manda International. Strikeforce shares the same office space, same employees, is engaged in the same business (construction), is represented by the same legal counsel, and is, on information and believe, wholly owned by Manda International. In all respects, Strikeforce is a mere instrumentality of Manda International.

45. Strikeforce was engaged at the Project performing discrete plumbing work at the direction of Naghieh and CRI. Notably, Strikeforce was not retained by Star Builders, but, at CRI's insistence, was retained directly by RH 160. Apparently recognizing the discord between CRI and Star Builders, Strikeforce's CEO Angelo Corrao proposed that his holding company, Manda, be retained to serve as the new Construction Manager for the Project and that Strikeforce could take over as general contractor.

46. In or around September 2019, Manda was retained to evaluate the Project to formulate a budget, schedule, scope documents, labor and materials survey and any other services required for the completion of the Project. In September 2019, Manda replaced Star as the Construction Manager in the New York Department of Buildings' records.

47. In reliance upon Manda's investigation, budget, schedule, and representation that it had the knowledge, skill, resources and financial ability to timely and cost effectively complete the Project, RH 160 engaged Manda as Construction Manager for completion of the Project.

48. On or about December 4, 2019, RH 160 and Manda entered into a written agreement in the form of a modified AIA Document A133-2009 Agreement Between Owner and Construction Manager as Constructor and modified AIA Document A201-2007 General Conditions of the Contract for Construction (the "CM Agreement").

49.     The CM Agreement is what is known in the construction industry as a cost-plus contract with a guaranteed maximum price, which acts as a ceiling on the overall contract sum.

50.     The basis for payment to Manda under the CM Agreement was the "Cost of the Work" plus an agreed upon fee based on a percentage of the amounts paid to subcontractors.

51.     By entering into the CM Agreement, Manda agreed to further the interests of RH 160. Specifically, Section 1.2 of the CM Agreement (A201 – General Conditions) states, in pertinent part:

> The Construction Manager accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner to cooperate with the Architect and exercise the Construction Manager's skill and judgment in furthering the interests of the Owner; to furnish efficient construction administration, management services and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an expeditious and economical manner consistent with the Owner's interests.

52.     Section 6.1.1 of the CM Agreement defines Cost of the Work as:

> The term Cost of the Work shall mean actual and documented costs necessarily incurred by the Construction Manager in the proper performance of the Work. Such costs shall be at rates not higher than the standard paid at the place of the Project except with prior consent of the Owner.

53.     Specifically, the CM Agreement provides that Cost of the Work includes, *inter alia*:

- "Wages of construction workers directly employed by the Construction Manager to perform the construction of the Work at the site or, with the Owner's prior written approval, at off-site workshops." CM Agreement at 6.2.1;

- "Wages or salaries of the Construction Manager's supervisory and administrative personnel when stationed at the site with the Owner's prior written approval. Such supervisory and administrative personnel are included in Construction Manager's fixed Fee/General Conditions." CM Agreement at 6.2.2;

- "Payments made by the Construction Manager to Subcontractors in accordance with the requirements of the subcontracts." CM Agreement at 6.2.3; and

- "Rental charges for temporary facilities, machinery. equipment and hand tools not customarily owned by construction workers that are provided by the Construction Manager at the site and costs of transportation, installation, minor repairs, dismantling and removal." CM Agreement at 6.5.2.

54. According to Section 6.8 of the CM Agreement, the Cost of the Work shall not include: "costs due to the negligence or failure of the Construction Manager, Subcontractors and suppliers," or "costs incurred repairing or correcting damaged or nonconforming work or otherwise due to Construction Managers' or Subcontractors' negligence." Section 6.8 of the CM Agreement also provides that Costs of the Work shall not include "Costs, other than costs included in Change Orders approved by the Owner, that would cause the Guaranteed Maximum Price to be exceeded."

55. Section 5.2.1. of the CM Agreement further provides that:

Construction Manager guarantees that the Contract Sum shall not exceed the Guaranteed Maximum Price set forth in the Guaranteed Maximum Price Amendment, as it is amended from time to time. To the extent the Cost of the Work exceeds the Guaranteed Maximum Price, the Construction Manager shall bear such costs in excess of the Guaranteed Maximum Price without reimbursement or additional compensation from the Owner.

56. The parties agreed that the Contract Sum would be set at $2,283,160.26. In detailing the scope of the work to be provided, Manda offered a scope of work prepared by its affiliate Strikeforce. The scope of work provided that Manda would be responsible for:

- Remediate plumbing issues in the E and D Core bathrooms, including:
  - o Disconnecting all fixtures and storing them in "a safe place";
  - o Removing all tile and sheetrock;
  - o Fixing all plumbing issues, installing sufficient blocking, and reinstalling tile;
- Remediate issues throughout the balance of the Project including:
  - o Repairing kitchen cabinets, vents, and refrigerators;
  - o Closing and patching walls;
  - o Installing appliances;
  - o Painting; and
- Miscellaneous finishes throughout the Project.

14

57.     Pursuant to the Section 7.1 of the CM Agreement, (A201 - General Conditions), the scope of work and a resulting increase to any amounts due could not be altered by the parties' course of conduct and Manda expressly waived any claims for unjust enrichment:

> No course of conduct or dealings between the parties, nor express or implied acceptance of alterations or additions to the Work, and no claim that the Owner has been unjustly enriched by any alteration of or addition to the Work, whether or not there is, in fact, any unjust enrichment to the Work, shall be the basis of any claim to an increase in any amounts due under the Contract or a change in any time period provided for in the Contract Documents. The Contractor hereby expressly waives any such aforementioned claims or defense based on such claims.

58.     Pursuant to Section 5.2.5 of the CM Agreement (A201 - General Conditions) Manda was responsible for all Subcontractors' compliance with the Contract Documents.

59.     Manda was obligated to provide back-up documentation evidencing the actual Cost of the Work. Section 7.1.4 of the CM Agreement states:

> With each Application for Payment, the Construction Manager shall submit payrolls (based on contract rates and the GC Monitor), petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner or Architect to demonstrate that cash disbursements already made by the Construction Manager on account of the Cost of the Work equal or exceed progress payments already received by the Construction Manager, less that portion of those payments attributable to the Construction Manager's Fee, plus payrolls for the period covered by the present Application for Payment.

60.     Pursuant to Section 3.19.2 of the CM Agreement (A201 - General Conditions) Manda was also required to keep a daily log of the work performed at the Project:

> During construction, Contractor shall record the progress of the Work and of the Project and shall keep a daily log in contractor's standard format containing a record of weather, Work accomplished by Subcontractors and Contractor on the Project site, number of workers (by trade and craft), deliveries to the Project site, problems encountered, visitors to the site and other relevant data. Contractor shall make the log available to Owner, Architect and Owner's Representative and provide copies upon request at any time.

61.     The CM Agreement also contained a No Waiver clause as follows:

No provision of the Contract Documents shall be deemed to have been waived by either party, either expressly, impliedly or by course of conduct, unless such waiver is in writing and signed by such party, which waiver shall apply only to the matter described in the writing and not to any subsequent rights of such party. Except as expressly set forth in this Agreement, no failure on the part of either party to exercise and no delay in exercising, any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise by either party of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right.

62. Pursuant to section 5.1.1 of the CM Agreement, Manda was to be paid "a fixed Fee/General Conditions of fifteen percent (15%) only on new subcontracts entered into by Construction Manager as well as on subcontract balances on Separate Contractors with Owner that Construction Manager manages. Acknowledging that Manda and Strikeforce are one and the same, Manda agreed in the CM Agreement that "there shall be no Fee/General Conditions on the subcontract between Construction Manager and Strikeforce Mechanical."

63. Section 5.1.3 of the CM Agreement further provided that a subcontractor's overhead and profits may not exceed "Fifteen percent (15%) of the subcontractor's actual documented costs."

64. Manda's alter ego Strikeforce and RH 160 were parties to a number of agreements, including those certain AIA Document 0706-2009, entered into between RH 160 and Strikeforce, dated as of May 20, 2019, June 19, 2019, August 14,2019, August 28, 2019, September 30, 2019, October 30, 2019, January 13, 2020 (together, the "Strikeforce Agreement") in connection with the Project.

65. Manda lacked the necessary construction expertise, management skills and financial resources to comply with its contractual obligations to complete the Project.

**CRI'S BREACHES OF CONTRACT**

66. CRI lacked the necessary construction expertise, management skills and financial resources to comply with its contractual obligations to complete the Project.

67.     Among other things, CRI breached its Agreement as follows: (i) failing to plan and manage the work in a cost effective and economical manner, (ii) failing to properly review requisition requests and invoices, which resulted in serious cost overruns; (iii) failing to perform any cost-control management, (iv) failing to monitor the quality of the work; and conceiving and furthering a scheme to approve fraudulent change orders and defective work product in an attempt to prolong CRI's retention and obtain additional fees.

68.     As a result, of CRI's complete derogation of its contractual responsibilities, the work at the Project was not properly sequenced, costs were not managed, and the Property was left without the very management and oversight that CRI was contracted to provide.  As a result of CRI's breaches of contract, Lender and RH 160 were damaged as the Project was required to retain new development supervisors in order to remediate the serious issues that developed under CRI and to preserve the value of the Project.

### MANDA AND STRIKEFORCE' BREACHEOFCONTRACT

69.     Manda lacked the necessary construction expertise, management skills and financial resources to comply with its contractual obligations to complete the Project.

70.     Among other things, Manda breached the CM Agreement as follows: (i) failing to act in the best interest of RH160, (ii) failing to plan, prosecute and manage the work in a cost effective and economical manner, (iii) failing to properly issue bid packages to subcontractors and enter into written subcontracts that complied with the CM Agreement, (iv) failing to perform cost-control management, (v) failing to coordinate subcontractor work; (vi) failing to protect work in place from damage during construction, and (vii) failing to provide required back-up documentation in support of payment applications.

71.     Upon information and belief, Manda held infrequent and insufficient coordination meetings with subcontractors. As a result, the work was not properly sequenced thereby causing significant delays and monetary damages.

72.     Additionally, work that was promised simply was not done.  While Manda and its alter ego Strikeforce were contracted to remediate the entire Project, and the costs of that remediation were clearly within the Cost of Work under the CM Agreement, the bulk of the work Manda and Strikeforce were retained to provide simply was not done.  As a result of Manda and Strikeforce's complete abdication of their responsibility to actually do the construction work that they were contractually obligated to do, the Project was forced to retain additional contractors at additional cost.

73.     Additionally, each of Manda and Strikeforce overcharged the Project for their time and labor.  Under the CM Agreement, Strikeforce's overhead and profits chargeable to the Project were not to exceed 15% of their total charges.  On information and belief, Strikeforce's invoice contains markups well in advance of the 15% maximum provided for under the Strikeforce Agreement.

74.     Manda also sought fees in excess of its contractual amounts.  Manda's fees and general conditions were to be capped at 15% of the amounts Manda incurred solely in respect of third party contracts.  The vast bulk of the invoices Manda included in its own payment requisitions were for work done by its alter ego Strikeforce, which were expressly excluded from the calculation of Manda's fee.

75.     Compounding the damage caused by Manda and Strikeforce's conduct is that RH 160 actually paid them for their work.  Manda received no less than $691,874.01 on account of work allegedly procured pursuant to the CM Agreement.

**DEFENDANT'S FRAUDULENT CONDUCT**

76.     Separate and apart from the millions of dollars of damages caused by CRI's, Manda's, and Strikeforce's myriad breaches of contract, the defendants, lead by CRI and Naghieh, engaged in a wide-ranging scheme to defraud RH 160 and Lender. Because the fraudulent scheme was collateral to Defendants' breaches of their agreements, they resulted in significant damage to RH 160 and Lender beyond the damages caused by the breaches of agreements.

**A. Naghieh's Actions Are Part of an Ongoing Criminal Enterprise**.

77.     Upon information and belief, CRI is dominated and controlled by its president Naghieh.

78.     Naghieh is a seasoned fraudster with a history of construction-related improprieties.  For example, in 2010, the 50-60 Longwood Condominium Trust sued Naghieh for breach of a settlement agreement arising from "allegations that Naghieh had abused his role as a former Trustee of the Condominium by receiving kickbacks in excess of $350,000.00 in connection with a multi-million dollar repair and restoration project at the Condominium." *See Trustees of 50-60 Longwood Condominium Trust v. Touraj Naghieh*, *Complaint*, at ¶4, 2010 WL 11243195 (Mass. Super. Oct. 13, 2010). Judgment was subsequently entered against Naghieh arising from that breach.  See, *Trustees of 50-60 Longwood Condominium Trust v. Touraj Naghieh*, *Judgment Upon Assessment of Damages*, at ¶4, 2010 WL 12884008 (Mass. Super. Nov. 10, 2011).

79.     In a second action commenced on or around May 8, 2017, Piero Loiero, an Italian national, and his wholly-owned limited liability company Otoront Corp also sued CRI and Naghieh for alleged construction-related fraud. As outlined in Loiero's Amended Complaint,

Naghieh and others at CRI fraudulently induced Loiero to purchase an apartment in New York for renovation. The Complaint continues that Naghieh, however, never truly intended to renovate the apartment and instead used the space, rent free, and without Loiero's permission. Naghieh then took measures to ensure that Loiero would remain unaware that the apartment was being used for CRI's sole benefit. Naghieh was able to perpetrate this scheme for over four years.

**B. CRI's Fraudulent Misrepresentations Regarding Project**

80.     As part of CRI's agreement, CRI would not be paid its full monthly fee until such time as the Project had obtained a TCO for at least two Cores. As such, CRI and Naghieh had every incentive to take only those steps necessary to obtain a TCO, in order to lock in his fee.

81.     On information and belief, Contractors, under Naghieh's direction, would cut corners on the completion of their tasks so that CRI could obfuscate the true state of the project to building examiners. In order to obtain a temporary certificate of occupancy for any Core, that Core must have adequately completed certain basic construction tasks. Among the various procedural hurdles was that the Special Inspector for the Project, Stephen Woodchecke from Domani Inspection Services, needed to sign and issue form TR-1, which is a technical report that indicates work was satisfactorily performed.

82.     Domani, however, issued a series of non-compliance reports indicating that serious work was needed to complete the physical remediation of the Project. In the absence of this work being actually performed, Domani questioned whether it could issue a TR-1.

83.     Recognizing its ability to more quickly capture its full fee, CRI took measures to hide the true state of the construction of the Project from RH 160. In particular, CRI, through its "advisors" the Moralis, understated both the quantity and quality of the work necessary to

complete the Project to all interested parties. As a result of their lack of transparency regarding the Project, RH 160 agreed on September 26, 2019, to undertake to finish the remediation promptly and indemnify Domani for any damages Domani may incur as a result of its issuing the TR-1 and certifying the Project ready for TCO.

84.     Notwithstanding CRI, Naghieh, and the Moralis' representations to Domani and to RH 160, the work necessary to remediate all the issues noted in the non-compliance reports remained largely unfinished until RH 160 retained yet another construction manager, here Ethic Corporation, to actually remediate and finish the Project.

85.     CRI's misrepresentations as to the state of the Project continued in 2019 when Lender's predecessor in interest was underwriting the Loan.  Indeed, at no point did CRI, who was tasked with liaising with Lenders, disclose the existence of the myriad non-compliance reports that it had swept away, and instead touted its success in obtaining a TCO, albeit under apparently false pretenses. These misrepresentations were designed to mislead and induce reliance on the part of Lender and RH 160.  Lender and RH 160 relied on these misrepresentations to their detriment.

**C.  CRI, Strikeforce, and Manda Further Defraud the Project**

86.     CRI's fraudulent conduct further benefitted CRI pecuniarily by permitting CRI to extend the duration of the Project.  CRI was well aware of the work necessary to complete the Project.  However, CRI was benefitted by the Project continuing in perpetuity.  As such, CRI sought ways to artificially extend the duration of the Project.

87.     In this regard, Manda and Strikeforce were willing co-conspirators.  Over the course of nearly six months, commencing on January 31, 2020 and ending on June 3, 2020, Manda submitted three requisitions for payment on the industry standard form Application and

Certification for Payment, AIA Document G702. These requisitions sought renumeration for work that was demonstrably not in place.

88. The typical process for submitting a requisition for payment was as follows: first, the contractor would submit the requisition to CRI, then to RH 160 and Bluarch, the architect of record for the Project. Bluarch would then review, reconcile, and approve the requisition for payment. At that point, the requisition would be presented to Lender for its review and approval before payment.

89. Manda would send unsubstantiated and poorly constructed requisitions. For example, on June 4, 2020, Manda submitted its Third requisition request to RH 160 for payment. That request was submitted to Bluarch for review and reconciliation on June 5, 2020. After nearly two weeks, the reconciliation was not complete and Bluarch raised serious concerns with Manda's bill. In an email dated June 19, 2020, from Antonio Di Oronzo, a Bluarch principal, to Zach Severson, a representative for RH 160, Mr. Di Oronzo explained was:

> still awaiting personnel back-up from Manda. Angelo came to my office this past Wednesday to discuss his requisition and is aware of the further documentation needed. A further issue are the partial payments made to Manda on previous requisitions ***without specifications of what stored work/materials were covered***. Can you please let us know? Do you agree that without this information ***we are in no position to reconcile the positions***? . . . Please let me know what to do about Angelo's G702 (requisition) (emphasis added)

90. The requisition was, further, demonstrably false. For example, line 11 of the Requisition indicates that Manda was charging for two men who were on site performing "field supervision." When pressed by Bluarch, however, Catherine Guida, Manda employee, conceded that only one person was present. Specifically, when asked who the "two men" performing field supervision were, Guida responded, "Super was Rober Knapp," one man. Manda also refused to provide any backup materials to substantiate its overly inflated claims.

91.     Notwithstanding the serious issues with the backup for the third requisition, Naghieh, unbeknownst to anyone at the Project, released money to Manda without any semblance of a business record for that payment.  On June 22, 2020, Antonio Di Oronzo, a Bluarch principal, noted in an email that Touraj released funds without any paperwork, which made the review of the already falsified third requisition, even more difficult.  Naghieh, apparently faced with his complicit conduct, was unavailable to meet – notwithstanding that he was contractually obligated to be at the Project no less than three days a week.  When Bluarch questioned the release of funds, Naghieh attempted to cover his tracks by delivering a one-page sheet that Bluarch noted in an email dated June 22, 2020, was "vague."

92.     Moreover, at Naghieh's direction, RH 160 submitted the third requisition to Lender for payment.  Lender's construction consultant determined that the Manda requisition was "basically impossible to review and confirm."  In addition to pointing out vague and deceptive line entries, Lender's consultant noted evidence of rampant overbilling, including indicating that at least one line item reflected being more than 100% complete.

93.     Perhaps worse, however, is Manda's fabrication of "change orders" in an attempt to charge grossly in excess of the GMP.  On or around July 8, 2020, Manda, at the request of Lender, submitted a Change Order Log (the "July 8 CO Log") purporting to show 26 change orders with a total of $548,706.96.  Of those 26 change orders, RH 160 approved purportedly only a handful of them, and the total value of the allegedly signed change orders on the July 8 CO Log is approximately $155,569.35.

94.     Additionally, a number of these initial change orders fall directly within the scope of work presented by Manda as part of the CM Agreement.  For example, the change orders include:

- Removing temporary countertops and installing new countertops;
- Sealing bathroom tile in the A, B, and C Cores;
- Fixing gas valves in kitchens;
- Installing laundry room saddles; and
- Painting in units.

Each of these items is expressly covered in the Scope of Work annexed to the CM Agreement, which unambiguously provides that the Guaranteed Maximum Price would include:

- Finishing of Marble tops in A/B/C cores;
- Sealing and caulking tiles in A/B/C cores;
- Installing "all plumbing" as required;
- Installing all appliances,
- Miscellaneous Painting through apartments;
- Supplying missing parts.

95.     Perhaps more egregious is Manda's attempt to misrepresent certain charges that are clearly within the scope of the CM Agreement as "new" work.  For example, Manda sought payment of a change order in the amount of $85,178.12 (Change Order 65-R) for "Excess Executive Time Spent at Building."  As noted above, Manda's site supervision is included in the Costs of the Work, and Manda is expressly prevented from charging its overhead to the Project. Manda additionally put in two change orders each for $21,500 (Change Order 46 and Change Order 65) that relate to "future work" in units 5A3 and 5E4.  The future work described on the minimal backup provided shows that these change orders are for plumbing remediation in these units, which was the very purpose of Manda's relationship with the building. Manda also included a change order for $29,000 on account of inspections by Morali, who was being paid pursuant to the CRI contract.

96.     The total of all purported change orders on the July Change Order Log that should have been included in the Guaranteed Maximum Price is $446,719.99.

97.    Manda brazenly submitted these Change Orders notwithstanding that Change Order work was expressly precluded absent a written, signed directive from RH 160 in advance of the work being performed.

98.    Manda's justification for their unbridled use of change orders is that Naghieh would approve change orders verbally, but then refused to commit that approval to writing: "Additionally requests for approval on change orders and/or requisitions have been made to Touraj, as he has led us to believe he is a responsible party on this project. Again he does not respond when we ask for his approval in writing for directions he has given verbally." Lender and RH 160 relied on these misrepresentations to their detriment in paying and advancing funds.

99.    Based on RH 160's and the Lender's investigation, these change orders were intentionally drafted to misrepresent the record in order to induce RH 160 to pay and Lender to advance, monies in excess of the Guaranteed Maximum Price.

100.    The July 8 CO Log provides that Manda "continues to calculate change order amounts for all additional work it performed regarding change orders for this Project and will continue to provide them once calculated." Stated differently, Manda was doing work without change orders and was making them up as they go along.

**D.    Manda Doubles Down on Its Change Order Fraud**

101.    In July, 2020, Manda's third requisition for payment was under heavy scrutiny from both RH 160 and Lender. Ultimately, as a result of Manda's inability to provide even the barest form of documentation Lender refused to advance funds on account of the requisition, and the requisition remained unpaid. Undeterred by reality, in or around August, 2020, Manda filed a Notice of Mechanic's Lien with the County Clerk for Kings' County. The Notice of Lien was willfully exaggerated, at nearly double the maximum amount of the CM Agreement.

102.     On or around October 30, 2020, construction counsel for RH 160 served a request under § 38 of the NY Lien Law seeking an itemized list of the items charged in the mechanic's lien.  Recognizing that its additional request was, at best, overstated, Manda amended their lien request on or around November 2, 2020 (the "Notice of Manda Lien") reducing the amount Manda was alleging remained unpaid to $1,595,309.25.

103.     On or around November 2, 2020, Manda did use the United States Postal Service to disseminate the Notice of Manda Lien to, inter alia, RH 160 and Lender.

104.     A summary review of the detail provided by Manda shows that the Notice of Manda Lien was a complete work of fiction, designed to extract unwarranted sums from Lender.

105.     According to the information provided as support of the Notice of Manda Lien, Manda was entitled to be on a total of 71 change orders (nearly 46 of which neither appeared in any requisition nor on the July 8 CO Log) for a total of $809,794.00.  Consistent with the fraudulent change orders presented in the July 8 CO Log, the vast majority of these entries consist of work that falls within the scope of the CM Agreement.  Of these 71 change orders, some $683,802.22 clearly relate to work that falls within the CM Contract.

106.     Much like the change orders in the July 8 CO Log, these change orders consisted primarily of fictitious time entries that were made to induce RH 160 to pay and Lender to advance funds.

107.     Moreover, even Manda's representations for the costs of work are either overstated or outside the scope of the CM Agreement.  For example, Manda seeks payment of $98,309.55 on account of insurance notwithstanding that section 6.8.1.9 of the CM Agreement expressly provides that CM's insurance is not a Cost of the Work and therefore shall not be reimbursed.  Manda claims that there is a $50,000 "material's allowance" meaning that Manda is

claiming all materials in excess of the $50,000 allowed are not Costs of the Work. However, there is no such exception in the CM Agreement, and therefore materials costs that are in excess of any internal accounting that only Manda agreed to shall be borne by Manda.

108.    The Notice of Manda Lien was submitted to fraudulently induce RH 160 to pay and Lender to advance funds. Lender and RH 160 relied on these misrepresentations to their detriment in paying and advancing funds.

**E.  Manda's Alter Ego Strikeforce Also Submits a Falsified Notice of Mechanics' Lien**

109.    Apparently believing that it would not have sufficient leverage by virtue of its own mechanics' lien, Manda also caused its alter ego Strikeforce to file its own falsified request for a mechanic's lien on or around August 5, 2020 (the "Notice of Strikeforce Lien").

110.    On or around August 5, 2020, Strikeforce used the United States Postal Service to transmit the Notice of Strikeforce Lien to, *inter alia*, RH 160 and Lender.

111.    Littered with typographical errors, the Notice of Strikeforce Lien is difficult to parse; however, in sum and substance, Strikeforce is contending that it is owed $1,901,587.06 on account of work done during the period where Manda was the Construction Manager.

112.    This amount is both patently fraudulent in its own respect and also illustrative of the overarching fraud perpetrated by the conspirators here. First, Strikeforce, in addition to being Manda's alter ego, was a subcontractor of Manda. As such, all amounts owing to Strikeforce should, necessarily, be accounted for in the amounts that Manda claims to be owed. However, Strikeforce, a subcontractor, claims to be owed over $400,000 more than Manda.

113.    As with the Manda requisitions, the bulk of the sums Strikeforce claims to be owed are on account of a purported series of change orders. Strikeforce submitted 38 change

orders totaling nearly $451,213.63. As with the Manda change orders, there is no documentation showing that any of these orders were approved.

114.     Upon information and belief all the change order scheme was endorsed by Naghieh, who processed payments based on these fictitious change orders.

115.     Additionally, Manda used its alter ego Strikeforce as an additional means of thwarting its obligations under the CM Agreement.  Strikeforce and Manda are alter egos. Manda and Strikeforce share the same owners and the same offices.  Moreover, they clearly share the same change order processing scheme.  As the following table demonstrates, Manda and Strikeforce issued change orders from the same change order log, with Manda change orders filling in the gaps in Strikeforce's change order numbering and vice versa:

| Change Order Number | Entity Submitting Change Order |
|---------------------|--------------------------------|
| 1-16                | Strikeforce                    |
| 17                  | None                           |
| 18                  | Manda                          |
| 19-25               | Strikeforce                    |
| 25                  | Manda                          |
| 26                  | Strikeforce                    |
| 27                  | Manda                          |
| 28                  | None                           |
| 29-35               | Manda                          |
| 36,37               | Strikeforce                    |
| 38                  | None                           |
| 39                  | Manda                          |
| 40-42               | Strikeforce                    |
| 43                  | Manda                          |
| 44-45               | Strikeforce                    |
| 46-47               | Manda                          |

115.     On the one change order number where Manda and Strikeforce overlapped, CO 25, each of Manda and Strikeforce were seeking reimbursement for the exact same charge: $11,000 on account of tile repair work.  This work should have been included in the amounts set forth in the CM Agreement.

116.    Indeed, Manda and Strikeforce used their alter ego status as a further attempt to defraud RH 160 and Lender.  For example, Strikeforce CO 45 seeks $26,221.25 for patching walls, notwithstanding that patching walls is not only included in the Cost of Work under the CM Agreement, but is in the very scope of work prepared by Strikeforce that serves as the basis for the Guaranteed Maximum Price.

**F.  Allegations Supporting Alter Ego**

117.    As discussed above, Manda ignored corporate formalities and dominated and controlled Strikeforce to perpetrate a fraud for their benefit.

118.    Strikeforce is the alter-ego of Manda as these companies are used interchangeably and have no real or legitimate separate corporate identities.

119.    Angelo Corrao represented to RH 160 that he was the sole member of each entity.

120.    Upon information and belief, Manda and Strikeforce were treated as the same company.

121.    Technically speaking, Manda was the construction manager for the Project, as it was the entity that signed the construction management agreement with RH 160.  However, both internally and externally, Manda ignored this fact and used and referred to Strikeforce and Manda interchangeably. It was as if they were one company subject to the sole direction of Mr. Corrao.

122.    Indeed, it became apparent to RH 160 throughout the Project that Manda, and Strikeforce were merely shells through which Mr. Corrao insulated himself from liability.  The façade was created solely for the purposes of Manda entering into the CM Agreement and also performing the work, notwithstanding that the CM Agreement prevented Manda from performing any work.

123.    Upon information and belief, each of Manda and Strikeforce fails to adhere to corporate formalities, e.g., not holding meetings or acknowledging corporate separateness from each other.

**FIRST CAUSE OF ACTION**
**RICO: 18 U.S.C. § 1962**
**(Against All Defendants)**

124.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**CULPABLE PERSONS**

125.    Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation, or limited liability company, or other  capable of holding a legal interest in property.

126.    At all relevant times, each of Defendants was, and is, a person that exists separate and distinct from the Enterprise, described below.

127.    Defendant CRI Holding Corp. is a Company formed under the laws of the State of New York.

128.    Naghieh controls CRI and is the mastermind of the Enterprise.

129.    Defendants Joseph Morali and Anthony Morali are individuals and instrumental in the furtherance of the Enterprise.

130.    Defendant Morali Architects is a limited liability company organized under the laws of New York.

131.    Defendant Corrao is an individual and was instrumental in the furtherance of the Enterprise.

132.    Defendant Manda is a limited liability company organized under the laws of New York.

133.     Defendant Strikeforce is a Company limited liability company organized under the laws of New York.

134.     Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

**THE ENTERPRISE**

135.     Defendants constitute an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

136.     Defendants are a group of persons that are associated-in-fact for the common purpose of carrying on an ongoing unlawful enterprise engaged in the conduct of their affairs through a continuing pattern of racketeering activity. The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of the racketeering activity.  There may also be other members of the enterprise who are unknown at this time.

137.     Since at least 2019 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of purportedly performing construction services while in fact defrauding each of RH 160 and Lender.

138.     These activities constitute racketeering activity within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because they violate 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

**THE PREDICATE ACTS**

139.     Defendants, each of whom are persons associated with, or employed by, the enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly.

in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1). The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

140. Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below. Defendants each committed at least two such acts or else aided and abetted such acts.

141. The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by Defendants have been continuous. There was repeated conduct during a period of time beginning in approximately 2000 and continuing to the present, and there is a continued threat of repetition of such conduct.

142. The Enterprise, as alleged herein, was not limited to the predicate acts and extended beyond the racketeering activity. Rather, it existed separate and apart from the pattern of racketeering activity for the legitimate business purpose of providing construction services to RH 160. Defendants have had and do have. Upon information and belief, legitimate business plans outside of the pattern of racketeering activity.

143. Plaintiff specifically alleges that Defendants participated in the operation and management of the Enterprise by overseeing and coordinating the commission of multiple acts of racketeering as described below.

144. Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud) in that they devised or intended to devise a scheme or artifice to defraud RH 160 and

Lender or to obtain money from RH 160 and Lender by means of false or fraudulent pretenses, representations or promises.

145. For the purpose of executing their scheme or artifice, Defendants caused delivery of various documents and things by the US. mails or by private or commercial interstate carriers, or received such therefrom. Defendants also transmitted or caused to be transmitted by means of wire communications in interstate commerce various writings, signs and signals. The acts of Defendants set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business. or that such use could have been foreseen, even if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

146. Defendants could not have carried out their scheme had they not used the U.S. mails or private or commercial interstate carriers or interstate wires. In furtherance of their scheme alleged herein, Defendants communicated among themselves and with RH 160 and Lender in furtherance of the scheme to defraud RH 160 and Lender. These communications were typically transmitted by wire (i.e., electronically) and/or through the United States mails or private or commercial carriers.

147. Specifically, each Defendant did transmit the executed form of their operative contracts through electronic mail or other means of electronic communications. Additionally, upon information and belief, each Defendant did use electronic means of communications in order to advance the aims of the Enterprise.

148. In addition to the myriad examples of communications throughout the life of the Enterprise, Defendant Manda did use the United States Postal Service on or around November 2, 2020, to transmit the fictitious Manda Notice of Lien to, *inter alia*, RH 160 and Lender. Corrao

did execute same and verify as to its accuracy. Upon information and belief, each of the change orders forming the basis of the fictitious Manda Notice of Lien were approved by Naghieh and CRI in furtherance of the fraud.

149. Defendant Strikeforce did use the United States Postal Service on or around November 2, 2020, to transmit the fictitious Strikeforce Notice of Lien to, *inter alia*, RH 160 and Lender. Corrao did execute same and verify as to its accuracy. Upon information and belief, each of the change orders forming the basis of the fictitious Strikeforce Notice of Lien were approved by Naghieh and CRI in furtherance of the fraud.

150. Defendants' shared objective was and is to divert funds to their own benefit and to defraud RH 160 and Lender. Lender and RH 160 reasonably and justifiably relied upon Defendants' false representations, false pretenses and deceptive communications, and Lender has been damaged as a direct and proximate result of Defendants' participation in such enterprise, as alleged herein.

**EACH MEMBER'S ROLE IN THE ENTERPRISE**

151. The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of defrauding the Project:

a. CRI and Naghieh are the mastermind of the Enterprise. As Project Advisor, CRI and Naghieh were responsible for oversight of the Project. CRI and Naghieh routinely accepted, reviewed, and paid out requisitions and change orders they knew to be fraudulent. CRI and Naghieh are the gateway to the financing for Manda and Strikeforce.

b. Manda is the Construction Manager for the Project and oversees the day to day construction happening on the Project. Manda works in concert with Strikeforce (which, in

sum and substance are the same entity given their 100% common ownership structure) to fabricate invoices and change orders which they then submit to their co-conspirators for "approval" and payment.

        c.        Strikeforce is a subcontractor on the Project. Because Manda, as construction manager, was contractually prohibited from performing construction tasks – hence the necessity of subcontractors – Strikeforce's participation in the scheme was critical so that the Defendants could defraud the RH 160 and Lender.

        d.        Anthony Morali, Joseph Morali, and Morali Architects, were essential to the fraud. CRI, Manda, and Strikeforce could not have created the appearance of construction without the assistance of a seasoned architect. Anthony Morali, Joseph Morali, and Morali Architects benefitted from this scheme by increasing their own fees – indeed multiple change orders from each of Manda and Strikeforce claim to arise either because of conversations with one of the Morali defendants or were to carry out tasks assigned by same.

    152.    The raison d'etre of this fraud was to extend the duration of the Project to benefit Naghieh and CRI and permit same to earn fees. It is prototypical racketeering – i.e., creating a problem (new construction problems) for the purpose of solving it through extortion (telling RH 160 and Lender that unless these problems were fixed by them at great cost, the Proejct would never receive TCO). This scheme is little more than extension of the frauds Naghieh, and later CRI, have perpetrated in similar fashion. Each defendant benefitted directly from this scheme either through direct participation in CRI's fees (i.e., Morali) or through the fabrication of change orders, which permitted Manda and its alter ego Strikeforce to loot the Project for more than they were contractually obligated to take.

**INTERSTATE COMMERCE**

153.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily activities.

154.    All communications between the members of the Enterprise, were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to communicate and collect monies purportedly owed for the false and fraudulent requisitions and change orders.

**INJURY AND CAUSATION**

155.    Lender has and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

156.    The injuries are proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars (if not more than a million) paid as a result of false and fraudulent requisitions and change orders.

157.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

158.    Pursuant to 18 U.S.C. § 1964(c), Churchill is entitled to treble damages, plus costs and attorneys' fees from Defendants.

**SECOND CAUSE OF ACTION**
**CONSPIRACY UNDER 18 U.S.C. § 1962(D)**
**(Against All Defendants)**

159.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

160.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

161.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the Project, requisitions and change orders, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role. Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy in violation of 18 U.S.C. § 1962(c).

162.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to defraud the Sponsor, including in violation of 18 U.S.C. § 1962(c). In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to submit false and fraudulent requisitions and change orders.

163.    The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

164.    Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

165.    The injuries to Plaintiff directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars.

166.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

167.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants. The Court should also enter such equitable relief as it deems just and proper to preclude the Defendants from continuing in their illegal activity.

### THIRD CAUSE OF ACTION
#### COMMON LAW FRAUD
**(Against All Defendants)**

168.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

169.    Defendants made numerous misrepresentations and/or material omissions concerning then-present facts to RH 160 and Lender that were false and which Defendants knew to be false when made. These misrepresentations and omissions were made with the specific intent on the part of the Defendants to induce reliance on the part of RH 160 and Lender.

170.    Red Hook 160 justifiably relied on the false representations and omissions made by Counterclaim Defendants to its severe detriment.

171.    Among the myriad material misrepresentations and/or material omissions made by Defendants include, but are not limited to:

- With full knowledge that work had been performed negligently or not at all, Manda and Strikeforce each executed payment requisitions to RH 160, which were delivered to Lender, containing certifications that work had been completed.

- With full knowledge that they were false, overstated, and deceptively phrased, Manda and Strikeforce each delivered copies of "change orders," that were designed to induce RH 160 to pay and Lender to advance funds, to pay.

- With full knowledge that they were false, overstated, and misrepresented the state of work done at the Project, Naghieh approved change orders and/or made payments on account of these fraudulent change orders;

- With full knowledge that the Project required significant remediation, Morali and CRI did made fraudulent statements to induce RH 160 to issue indemnifications and to cause special inspectors to grant approvals in order to ensure that CRI, and therefore Naghieh and Morali, would receive larger fees;

- Naghieh directed outright sabotage of construction work and made knowingly false representations and omissions concerning such work in an effort to induce and justify additional unwarranted payments from RH 160 and to induce Red Hook 160 to keep CRI as the owner's representative;

- CRI, Naghieh, Manda, Strikeforce, and Corrao knowingly engaged in overbilling schemes to induce RH 160 to pay, and Lender to advance funds, for labor and materials at false and inflated rates.

172. Defendants at all times knew that its material representations and/or omissions were false.

173. Defendants made these misrepresentations and/or omissions of material fact for the purpose of inducing RH 160 and Lender to rely upon them.

174. RH 160 and Lender justifiably relied on Defendants' misrepresentations and/or material omissions.

175. RH 160's and Lender's justifiable reliance on the Defendants' misrepresentations and/or material omissions has caused RH 160 to incur damages.

176. The detrimental effects of Defendants' misrepresentations made intentionally with knowledge of the falsity thereof and intentional material failure to disclose are too numerous to list in full, but in material part those impacts were as follows:

- The fraudulent acts prevented RH 160 from being able to control the progress of the Project and seek timely and meaningful remedies for Defendant's conduct or mitigate the cumulative effect of such acts of deception.

- Defendant's acts of fraud and failures to disclose resulted in RH 160's and Lender's inability to gauge the full consequences of Defendant's conduct and thus resulted in, among other things, Red Hook 160's inability to recapture lost time and make up for lost time and effort on the Project.

- RH 160 continued to allow Defendants to remain employed at the Project and therefore Defendants were able to continue their fraudulent misrepresentations and continue to obtain sums they were not due.

- Lender was induced to advance monies to pay for requisitions that were misleading and fraudulent.

- RH 160 was required to hire additional consultants and divert its own employees from other parts of its business to make up for Defendant's shortfalls at the Project.

- Lender was required to retain additional consultants and expend significant time and resources to protect the value of its collateral, which was directly affected by the Defendants' fraudulent schemes.

177.    As a result of the foregoing, Lender has been harmed and has suffered monetary damages in an as yet undetermined amount.

178.    Additionally, because the above-described fraudulent action of the Defendants were gross, wanton and willful, an award of punitive damages against the Defendants and in favor of Lender is justified.

## FOURTH CAUSE OF ACTION
### BREACH OF CONTRACT
**(Against CRI)**

179.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

180.    RH 160 and CRI entered into the CRI Agreement for CRI to perform work at the Project.  The CRI Agreement was assigned to Lender.

181.    RH 160 performed all of its obligation under the CRI Agreement.

182.    CRI breached the CRI Agreement by, among other things, (i) failing to plan and manage the work in a cost effective and economical manner, (ii) failing to properly review requisition requests and invoices, which resulted in serious cost overruns; (iii) failing to perform

any cost-control management, (iv) failing to monitor the quality of the work; and conceiving and furthering a scheme to approve fraudulent change orders and defective work product in an attempt to prolong CRI's retention and obtain additional fees.

183.   As a result of CRI's breaches of the CRI Agreement, RH 160 and Lender have been, and continues to be, damaged in an amount to be proven at trial, but believed to be not less than $20,000,000.

**FIFTH CAUSE OF ACTION**
**BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING**
**(Against CRI)**

184.   Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

185.   An implied covenant of good faith and fair dealing governed the services CRI agreed provide to RH 160 for the Project in accordance with the CRI Agreement.  The CRI Agreement was assigned to Lender.

186.   CRI breached the covenant of good faith and fair dealing by not implementing any cost controls for the Project, improperly approving fraudulent change orders, disguising faulty construction work in an attempt to prolong its own retention, and acting arbitrarily and unreasonably respect of the work CRI claims was performed at the Project.

187.   As a result of CRI's breach of the implied covenant of good faith and fair dealing, RH 160 and Lender have been, and continue to be, damaged in an amount to be proven at trial, but believed to be in excess of $20,000,000.

**SIXTH CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(Against Manda)**

188.   Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

189. RH 160 and Manda entered into the CM Agreement for Manda to perform work at the Project. The CM Agreement was assigned to Lender.

190. RH 160 performed all of its obligation under the CM Agreement.

191. Manda breached the CM Agreement by, among other things, (i) failing to act in the best interest of RH 160, (ii) failing to plan, prosecute and manage the work in a cost effective and economical manner, (iii) failing to properly issue bid packages to subcontractors and enter into written subcontracts that complied with the CM Agreement, (iv) failing to perform cost-control management, (v) failing to coordinate subcontractor work; (vi) failing to protect work in place from damage during construction, and (vii) failing to provide required back-up documentation in support of payment applications.

192. As a result of Manda's breaches of the CM Agreement, RH 160 and Lender have been, and continues to be, damaged in an amount to be proven at trial, but believed to be not less than $20,000,000.

## SEVENTH CAUSE OF ACTION
## BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING
### (Against Manda)

193. Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

194. An implied covenant of good faith and fair dealing governed the services Manda agreed provide to RH 160 for the Project in accordance with the CM Agreement. The CM Agreement was assigned to Lender.

195. Manda breached the covenant of good faith and fair dealing by not implementing any cost controls for the Project, improperly submitting fraudulent and deceptive requests for requisitions , disguising faulty construction work in an attempt to prolong its own retention, and

acting arbitrarily and unreasonably respect of the work Manda claims was performed at the Project.

196.    As a result of Manda's breach of the implied covenant of good faith and fair dealing, RH 160 and Lender have been, and continue to be, damaged in an amount to be proven at trial, but believed to be in excess of $20,000,000.

**EIGTH CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(Against Strikeforce)**

197.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

198.    RH 160 and Strikeforce entered into the Strikeforce Agreement for Strikeforce to perform work at the Project.  The Strikeforce Agreement was assigned to Lender.

199.    RH 160 performed all of its obligation under the Strikeforce Agreement.

200.    Strikeforce breached the Strikeforce Agreement by, among other things, (i) failing to act in the best interest of RH 160, (ii) failing to perform cost-control management, (iii) failing to coordinate subcontractor work; (iv) failing to protect work in place from damage during construction; (v) failing to provide required back-up documentation in support of payment applications; and (vi) performing defective work in an attempt to charge RH 160 for fixing its own construction defects.

201.    As a result of Strikeforce's breaches of the Strikeforce Agreement, RH 160 and Lender have been, and continues to be, damaged in an amount to be proven at trial, but believed to be not less than $20,000,000.

**NINTH CAUSE OF ACTION**
**BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING**
**(Against Strikeforce)**

202.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

203.   An implied covenant of good faith and fair dealing governed the services Strikeforce agreed provide to RH 160 for the Project in accordance with the Strikeforce Agreement.  The Strikeforce Agreement was assigned to Lender.

204.   Strikeforce breached the covenant of good faith and fair dealing by not implementing any cost controls for the Project, improperly submitting fraudulent and deceptive requests for requisitions , disguising faulty construction work in an attempt to prolong its own retention, and acting arbitrarily and unreasonably respect of the work Manda claims was performed at the Project.

205.   As a result of Strikeforce's breach of the implied covenant of good faith and fair dealing, RH 160 and Lender have been, and continue to be, damaged in an amount to be proven at trial, but believed to be in excess of $20,000,000.

## PRAYER FOR RELIEF

Plaintiff respectfully requests judgment against Defendants be entered as follows:

A.   Awarding treble damages resulting from Defendants' violation of 18 U.S.C. § 1962;

B.   Awarding damages resulting from Defendants' fraud;

C.   Awarding damages resulting from CRI's breach of CRI Agreement in an amount to be adduced at trial, but believed to be in excess of $20,000,000;

D.   Awarding damages resulting from CRI's breach of implied duty of good faith and fair dealing in respect of the CRI Agreement in an amount to be adduced at trial, but believed to be in excess of $20,000,000;

E.   Awarding damages resulting from Manda's breach of CM Agreement in an amount to be adduced at trial, but believed to be in excess of $20,000,000;

F.      Awarding damages resulting from Manda's breach of implied duty of good faith and fair dealing in respect of the CM Agreement in an amount to be adduced at trial, but believed to be in excess of $20,000,000;

G.      Awarding damages resulting from Strikeforce's breach of Strikeforce Agreement in an amount to be adduced at trial, but believed to be in excess of $20,000,000;

H.      Awarding damages resulting from Strikeforce's breach of implied duty of good faith and fair dealing in respect of the Strikeforce Agreement in an amount to be adduced at trial, but believed to be in excess of $20,000,000; and

I.      Granting such other and further relief as the Court may deem just or proper.

### **DEMAND FOR JURY TRIAL**

Plaintiff respectfully demands a trial by jury for all issues so triable in this action.

Dated: May 4, 2021
New York, New York               ARMSTRONG TEASDALE LLP

By: _____
      Ryan M. Wilson, #5137732
      919 Third Avenue, 37th Floor
      New York, NY 10022
      (212) 209-4400
      rwilson@atllp.com

*Attorneys for the Plaintiff JGIAP RH 160 LLC*